# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION | * |
| | * |
| This Document relates to: | MDL Docket No. 1332 |
| *Sun Microsystems, Inc. v.* | * |
| *Microsoft Corp.,* | Hon. J. Frederick Motz |
| | * |
| Civil Action No. C-02-01150 RMW (PVT) (N.D. Cal.) | * |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

### SECOND AMENDED COMPLAINT FOR:

1.  ILLEGAL MAINTENANCE OF INTEL-COMPATIBLE PC OPERATING SYSTEM MONOPOLY (SHERMAN ACT § 2)

2.  ILLEGAL MONOPOLIZATION OF WEB BROWSER MARKET (SHERMAN ACT § 2)

3.  UNLAWFUL TYING OF INTERNET EXPLORER TO WINDOWS PC OPERATING SYSTEM (SHERMAN ACT § 1)

4.  ATTEMPTED MONOPOLIZATION OF THE WORKGROUP SERVER OPERATING SYSTEM MARKET (SHERMAN ACT § 2)

5.  UNLAWFUL TYING OF WINDOWS WORKGROUP SERVER OPERATING SYSTEM TO WINDOWS PC OPERATING SYSTEM (SHERMAN ACT § 1)

6.  UNLAWFUL TYING OF IIS WEB SERVER SOFTWARE TO WINDOWS WORKGROUP SERVER OPERATING SYSTEM (SHERMAN ACT § 1)

7.  ATTEMPTED MONOPOLIZATION OF THE MARKET FOR GENERAL PURPOSE, INTERNET-ENABLED, DISTRIBUTED COMPUTING PLATFORMS (SHERMAN ACT § 2)

8.  UNLAWFUL TYING OF .NET FRAMEWORK TO WINDOWS PC AND WORKGROUP SERVER OPERATING SYSTEMS (SHERMAN ACT § 1)

9.  UNLAWFUL EXCLUSIVE DEALING AND OTHER EXCLUSIONARY

AGREEMENTS (SHERMAN ACT § 1)

10. ILLEGAL MONOPOLIZATION OF THE OFFICE PRODUCTIVITY SUITE MARKET (SHERMAN ACT § 2)

11. CARTWRIGHT ACT (CAL. BUS. & PROF. CODE §§ 16720 ET SEQ.)

12. UNFAIR COMPETITION (CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.)

13. COPYRIGHT INFRINGEMENT (17 U.S.C. § 501 ET SEQ.)

DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

PAGE NO.

I.      NATURE OF THE CASE ........................................................................................1

II.     THE PARTIES.......................................................................................................8

III.    JURISDICTION AND VENUE ............................................................................9

IV.     INTRADISTRICT ASSIGNMENT ......................................................................9

V.      MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO THE INTEL-
        COMPATIBLE PC OPERATING SYSTEM MARKET.........................................9

        A.    MICROSOFT'S MONOPOLY POWER ........................................................9

        B.    THE ECONOMIC CHARACTERISTICS OF SOFTWARE DEVELOPMENT AND THE
              APPLICATIONS BARRIER TO ENTRY .............................................11

        C.    THE RISE OF THE INTERNET AND THE MIDDLEWARE THREAT TO
              MICROSOFT'S PC OPERATING SYSTEM MONOPOLY ......................................17

        D.    MICROSOFT'S ANTICOMPETITIVE ACTS AGAINST THE JAVA PLATFORM .....................19

        E.    MICROSOFT'S ANTICOMPETITIVE ACTS AGAINST LINUX................................................37

VI.     MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE
        BROWSER MARKET ............................................................................38

        A.    WEB BROWSER MARKET ...............................................................38

        B.    MICROSOFT'S ANTICOMPETITIVE CONDUCT AND DAMAGE TO CONSUMERS
              AND COMPETITION IN THE WEB BROWSER MARKET................................................39

VII.    MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE
        WORKGROUP SERVER OPERATING SYSTEM MARKET ...............................................40

        A.    THE WORKGROUP SERVER OPERATING SYSTEM MARKET ...........................................40

        B.    WORKGROUP SERVER THREAT TO MICROSOFT'S PC OPERATING SYSTEM
              MONOPOLY.......................................................................................42

C.      MICROSOFT'S STRATEGY FOR MONOPOLIZING THE WORKGROUP SERVER OPERATING SYSTEM MARKET ...................................................................43

D.      MICROSOFT'S EFFORTS TO REPLICATE ITS APPLICATION BARRIER IN THE WORKGROUP SERVER OPERATING SYSTEM MARKET ......................................44

E.      MICROSOFT'S EFFORTS TO LOCK-OUT COMPETITION BY FORECLOSING INTEROPERABILITY EFFORTS AND ENGAGING IN DISCRIMINATORY LICENSING PRACTICES ....................................................................................46

F.      MICROSOFT ENSURES THAT ONLY ITS WORKGROUP SERVER OPERATING SYSTEM CAN FULLY INTEROPERATE WITH CRITICAL FEATURES AND FUNCTIONALITY IN ITS PC OPERATING SYSTEM ...........................................49

G.      OTHER TECHNICAL TIES AND BUNDLING PRACTICES THAT FORCE THE ADOPTION OF MICROSOFT SERVER APPLICATIONS THAT WILL ONLY RUN ON MICROSOFT'S WORKGROUP SERVER OPERATING SYSTEM ....................................53

H.      MICROSOFT'S EXCLUSIONARY CONDUCT REGARDING CLIENT ACCESS LICENSES AND CERTIFICATION PROGRAMS FOR APPLICATIONS ....................................54

VIII.   MICROSOFT'S TYING OF ITS IIS WEB SERVER SOFTWARE TO ITS WORKGROUP SERVER OPERATING SYSTEM ...................................................................56

A.      WEB SERVER SOFTWARE MARKET ..............................................................................56

B.      MICROSOFT'S UNLAWFUL TYING OF IIS TO ITS WORKGROUP SERVER OPERATING SYSTEM ......................................................................................57

IX.     MICROSOFT'S TYING OF ITS ACTIVE DIRECTORY SERVER SOFTWARE TO ITS WORKGROUP SERVER AND PC OPERATING SYSTEMS ...............................57

X.      MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE OFFICE PRODUCTIVITY SUITE MARKET ........................................................................59

A.      OFFICE PRODUCTIVITY SUITE MARKET ......................................................................59

B.      MICROSOFT'S ANTICOMPETITIVE CONDUCT ..............................................................60

XI.     MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE MARKET FOR GENERAL PURPOSE, INTERNET-ENABLED DISTRIBUTED COMPUTING PLATFORMS ..........................................................................64

ii.

A.      MARKET FOR GENERAL PURPOSE, INTERNET-ENABLED DISTRIBUTED COMPUTING PLATFORMS ............................................................................64

B.      MICROSOFT'S ANTICOMPETITIVE CONDUCT AND DAMAGE TO CONSUMERS AND COMPETITION IN THE GENERAL PURPOSE, INTERNET-ENABLED, DISTRIBUTED COMPUTING PLATFORM MARKET ............................................68

XII.   MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO PASSPORT......................73

XIII.  MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO DEVELOPER TOOLS.............................................................................................................75

XIV.  MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO LICENSING ....................75

XV.   CLAIMS FOR RELIEF ..........................................................................................78

## I.    NATURE OF THE CASE

**1.**    This is an action brought pursuant to the antitrust laws of the United States as well as the laws of the State of California to restrain anticompetitive conduct by Defendant Microsoft Corporation ("Microsoft"), and to remedy the damage suffered by Plaintiff Sun Microsystems, Inc. ("Sun"), as a result of Microsoft's illegal efforts to maintain and expand its monopoly power.  In addition, this action seeks to enjoin Microsoft from infringing Sun's copyrights by unlawfully distributing products outside the scope of the limited license that Sun granted to Microsoft.

**2.**    In a prior antitrust action, Microsoft was held to have illegally maintained its monopoly over the market for Intel-compatible personal computer ("PC") operating systems by engaging in anticompetitive acts that impeded the distribution and/or use of alternative platforms that threatened Microsoft's monopoly, including the Java™ platform.  *See United States v. Microsoft*, 87 F. Supp. 2d 30 (D.D.C. 2000), *aff'd in part, rev'd in part*, 253 F.3d 34 (D.C. Cir. 2001), *cert. denied*, 122 S. Ct. 350 (2001).

**3.**    The adjudicated facts in that case establish that Microsoft illegally maintained a monopoly over the market for PC operating systems by undermining the ability of rival software platforms like Netscape Corporation's Navigator browser and Sun's Java technology to compete in that or closely related markets.[1]  By offering consumers the ability to run competing applications on operating systems other than Microsoft's Windows operating system, the Navigator browser and Java platform threatened to reduce or eliminate the applications barrier to competition that sustains Microsoft's monopoly.[2]  Microsoft fully recognized the threat that these middleware platforms posed to its continued monopoly over PC operating systems and contrived to maintain that monopoly by restricting consumer access to these and any other non-Microsoft middleware platforms.  By eliminating the ability of alternative platforms to compete with Microsoft's Windows operating system, Microsoft

---

[1]  *United States v. Microsoft Corp.*, 253 F.3d 34, 46 (D.C. Cir. 2001) ("*Microsoft III*").

[2]  *United States v. Microsoft Corp.*, 84 F Supp. 2d 9, § 68 (D.D.C. 1999) ("*Findings of Fact*") (explaining how middleware technologies such as the Navigator browser and the Java platform have the ability to weaken the application barrier to entry).

not only illegally maintained its monopoly, but it also dramatically increased the economic power derived from that monopoly, such that Microsoft now has monopolized, or is dangerously close to monopolizing, a number of adjacent markets including the web browser market, the workgroup server operating system market, the web server market, the general-purpose Internet-enabled distributed computing platform market, and the office productivity suite market.

4.     The commercial appeal of any computing platform is dependent in very large measure on the number of consumers who own or use the platform. The greater the number of users, the greater the demand for applications capable of running on that platform. The greater the demand for the platform applications, the greater the number and variety of applications developed for the platform. And the greater the number and variety of applications developed for a platform, the greater the consumer demand for a given computing platform.[3] Once started, this "positive feedback effect" can and will sustain the adoption and commercial success of platform software, such as the Windows operating system or the Java platform. Distribution of the underlying platform is therefore critical to successful competition in platform software.[4] Unless a platform enjoys widespread and sustained distribution, such that large numbers of computer users have the platform installed and available for use on their computer systems, the feedback cycle of application development and platform adoption will not take effect.

5.     As the District Court found, and the Court of Appeals affirmed, Microsoft engaged in a series of illegal acts to choke off the distribution channels for the Navigator browser and Java platform.[5] Microsoft has since even further restricted distribution of the Java platform by refusing to distribute any implementation of the Java runtime[6] on Microsoft's Windows XP operating system. By restricting and disrupting the distribution of the Navigator browser and the Java platform, Microsoft has sought to limit

---

[3]   *See Findings of Fact*, 84 F. Supp. 2d at §§ 39-40.

[4]   *See Microsoft III*, 253 F.3d at 55-60, 60-61, 70-71; *Findings of Fact*, 84 F. Supp. 2d at §§ 36-52, 143-44.

[5]   *See Microsoft III*, 253 F.3d at 61, 72, 75-76; *Findings of Facts*, 84 F. Supp. 2d at §§ 357, 395-402.

[6]   Hereinafter, the terms "Java runtime" and "Java runtime environment" refer to any licensed implementation of the Java virtual machine and Java class libraries.

the numbers of computer users with access to these alternative platforms and thereby also limit the demand for, and economic incentives supporting, application development on those platforms. By decreasing the distribution of non-Microsoft platforms, such as the Navigator browser and the Java platform, Microsoft knew that it also could decrease the number and variety of applications developed for such platforms, and thus their relative commercial appeal to consumers.

6.    In addition to choking off distribution of the Java platform, Microsoft also acted to fragment the Java platform, and thereby prevent a "positive feedback effect" from developing for the Java platform, in a number of unlawful ways. As the United States District Court for the Northern District of California found in a prior action in connection with the issuance of two preliminary injunctions against Microsoft,[7] Microsoft (a) breached its license agreement with Sun by distributing incompatible implementations of the Java platform, (b) contracted with third parties to exclusively use its differentiated and incompatible implementations, and (c) deceptively promoted its incompatible runtimes and tools as though they were compatible. By flooding the market with its incompatible implementations of the Java technology, while choking off distribution of compatible implementations of that same technology, Microsoft significantly reduced the economic incentive for developers to write applications to the Java platform, since the market for such applications would be smaller than the market for Microsoft-specific applications written either to Windows or to Microsoft's ubiquitously distributed incompatible implementations of the Java technology. Microsoft's acts also increased the costs and reduced the demand to adopt and deploy the Java platform.

7.    But for Microsoft's unlawful fragmentation of the Java platform and its unlawful attack on the distribution of the Navigator and Java platforms, the installed base of these alternative platforms would have been far greater today. So too would the economic incentives and choices of software developers and consumers. Developers would have had the opportunity to develop Java-based

---

[7]  *See Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301 (N.D. Cal. 1998); *Sun Microsystems, Inc. v. Microsoft Corp.*, 21 F. Supp. 2d 1109 (N.D. Cal. 1998), *vacated and remanded*, 188 F.3d 1115 (9th Cir. 1999); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992 (N.D. Cal. 2000); *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026 (N.D. Cal. 2000).

applications for a much larger base of installed systems with less overall cost and effort. Developers also would have had the opportunity to choose among a variety of competing platforms on which to develop Java-based applications with the features, performance and price that customers demand. Consumers would have had the opportunity to choose from among a variety of competing platforms – not just Microsoft's Windows platform – based upon performance, cost, interoperability, or personal preference.

8.    Indeed, because the Navigator and Java platforms were "cross-platform" – that is, they ran on top of a variety of operating systems, not just Microsoft's Windows operating system – consumers would have had the ability to run applications written for the Navigator browser and Java platform on any operating system, not just Microsoft's Windows operating system. By dramatically lowering the cost to switch applications from one operating system to another, the Navigator and Java platforms directly attacked the applications barrier to competition that protects Microsoft's monopoly over PC operating systems, and greatly reduced the cost to consumers and developers alike of switching away from Microsoft's monopoly platform. In short, but for Microsoft's anticompetitive conduct, consumers today would have enjoyed far greater freedom, at far less cost, to choose among competing operating systems based on their comparative features, performance, and price, rather than simply the number of applications they support.

9.    By unlawfully fragmenting the Java platform and choking distribution of the Navigator and Java platforms, Microsoft has both entrenched and increased its monopoly power in PC operating systems by debilitating a serious threat to that monopoly. With that threat debilitated, the "positive feedback effect" protecting Microsoft's monopoly continues unabated, creating overwhelming and ever-rising incentives for both developers and operating system consumers to increase the market share and market power of Microsoft.

10.    The Java platform was particularly threatening to Microsoft because it had no viable, competitive alternative at the time the Java platform was introduced. Recognizing that it would take

years to develop a comparable platform, Microsoft sought to either gain control over the Java platform or reduce its appeal and delay its adoption. Although its efforts to seize control of the Java platform were ultimately rebuffed, Microsoft was successful in reducing the appeal and adoption of the Java platform. In particular, Microsoft greatly reduced, if not eliminated, the incentive of software developers to create applications for the Java platform that required the presence of a Java runtime on desktop computers.

11.    Microsoft has used the resulting delay and reduced demand for adoption and deployment of the Java platform to good effect. After five years of development, it has now released the first version of a middleware platform that largely copies and mimics many of the pioneering advances of the Java platform. Microsoft calls its imitation the .NET Framework. But unlike the Java platform, the .NET Framework is designed for use with Windows only, and is not available for porting to any non-Microsoft operating system. In other words, it is designed to maintain and expand the applications barrier to competition, not erode it.

12.    Microsoft has touted the belated introduction of its new .NET platform as its most important initiative, one that will fundamentally transform its own business and the Internet in general. Just as it developed the Windows platform on top of MS-DOS in order to encourage developers to write to the new platform, Microsoft now will provide the .NET platform as a middleware layer on top of Windows, and encourage developers increasingly to write their applications to this new platform, gradually obsolescing the Windows platform and transferring Microsoft's monopoly from the PC operating system to this new middleware layer. By bundling the .NET Framework with Windows, Microsoft hopes to exploit its illegally maintained monopoly power to leverage market share for its new platform. Microsoft hopes then to use its ill-gotten .NET market share to dominate the increasingly important realm of server-based computing, a realm that currently poses the greatest threat to Microsoft's PC hegemony. By infusing .NET with Microsoft-specific interfaces and protocols shared by Microsoft servers, Microsoft threatens to control, and render Microsoft-specific, the market for

dynamic web services and other server-based computing applications.  Microsoft also hopes to leverage its monopoly power into the adjacent markets for embedded and handheld devices.

13.    Microsoft is currently abusing its market power with anticompetitive effect by precluding, obstructing and impeding the distribution and utilization of competing platforms that it believes threaten its ability to maintain or expand its monopoly power, including Sun's Java platform, its Solaris desktop and workgroup server operating systems, its Sun ONE web servers and directory servers, and Star Office productivity suites.  Microsoft also is abusing its monopoly power with anticompetitive effect by forcing others to distribute, acquire, license and/or use Microsoft's operating systems, browsers, Internet-enabled distributed computing platforms, office productivity suites, and/or application development tools in lieu of potential substitute products of Sun and other competitors.  By means of product bundling, exclusionary dealing, technical tie-ins and/or lock-outs, discriminatory licensing terms, and other contractual inducements or restraints, Microsoft forces distributors, consumers and software developers who wish to substitute competing products for Microsoft's products to incur increased and unnecessary costs to do so, thus raising and sustaining the barriers to competition that protect its PC operating system monopoly.

14.    Microsoft also is abusing the power derived from its PC operating system, browser, and office productivity suite monopolies with anticompetitive effect to extend its monopolies into adjacent markets where products either interoperate with Microsoft's monopoly products or share applications with Microsoft's monopoly products.  In the emerging world of networked devices and services, the commercial appeal and success of systems, applications, devices and services in such adjacent markets as servers, Internet-enabled distributed computing platforms, telephones, PDAs, video game systems, television set-top boxes, and web-based services are in large measure dependent on their ability to interoperate with PCs or PC applications via the Internet or other networks.  Microsoft is abusing its monopoly power over PC operating systems, web browsers, and office productivity suites to deny competing systems, applications, devices, and services the same ability to interoperate fully and

completely with Microsoft's PC operating systems, applications, browsers and productivity suites as Microsoft's operating systems, applications and services enjoy.

15.     By secretly manipulating the interfaces and protocols supported by its Windows operating systems, Internet Explorer browser, and Office productivity suite, Microsoft is controlling which products and services in adjacent markets are capable of effectively interoperating with its monopoly products.  Not only does this permit Microsoft to deprecate the appeal and functionality of competing products and services relative to Microsoft's products and services, but it also denies developers and consumers the benefits of competitive choice.  Instead of permitting developers and consumers the opportunity to choose a workgroup server operating system, Internet-enabled distributed computing platform, telephone, application, web server, or directory service based on its competitive merits, Microsoft is increasingly forcing developers to limit their application development, and consumers to limit their purchases to Microsoft's platforms, products and services since they alone can interoperate fully and effectively with Microsoft's unlawfully maintained monopoly products.

16.     By illegally exploiting its monopolies to acquire and utilize a chokehold over networked connections to PCs, servers and other devices, Microsoft is dramatically expanding its power to deny consumers the benefits of choice and competition in adjacent markets as well.  Unless and until that power is effectively checked and ultimately eliminated, Microsoft's past practices and insatiable ambition demonstrate that it will continue to destroy competition in each of these enormously important markets.

17.     Sun brings this action for two reasons.  First, Sun brings this action to restore competition in the markets in which Microsoft restrains competition by means of its monopoly power.  Critical to restoring such competition is Sun's request that Microsoft be enjoined from distributing Windows or Internet Explorer unless such products also incorporate the latest, compatible version of the Java runtime environment.  Also critical to restoring such competition is Sun's request that Microsoft be required to disclose all interfaces, protocols, and technical information that Microsoft employs to enable its

monopoly operating system, browser, and office productivity suite to interoperate effectively with other products, applications, or software.

18.     Second, Sun brings this action to remedy the continuing harm that Sun has suffered as a result of Microsoft's illegal monopolization of the PC operating system, web browser, and office productivity suite markets, its unlawful attempt to monopolize the workgroup server and Internet-enabled distributed computing platform markets, and its unlawful exclusive dealing and tying practices. Such harm to Sun includes, without limitation, diminished licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill.

## II.     THE PARTIES

19.     Plaintiff Sun Microsystems, Inc., is a corporation existing under the laws of the State of Delaware with its principal place of business in Palo Alto, California.  Sun is a leader in the design, manufacture, and sale of microprocessors, workstations, servers, operating systems, enterprise software, middleware, office productivity suites, storage systems, and various network services.  Sun is also the creator, developer, and licensor of the Java technology.  In addition to products designed to run Sun's Solaris™ operating system, the Linux operating system, or the Java platform, Sun also offers products designed to run Windows applications on Sun workstations.

20.     Defendant Microsoft Corporation is a corporation existing under the laws of the State of Washington with its principal place of business in Redmond, Washington.  Microsoft is the world's largest supplier of computer software for personal computers.  Among other things, Microsoft develops, markets, and distributes software products, including PC operating system software (e.g., Windows XP, Windows 2000, Windows 98), workgroup server operating system software (e.g., Windows Server 2003 Standard Edition, Windows 2000 Server, Windows NT Server), enterprise server operating system software (e.g., Windows 2000 Datacenter Edition, Windows 2003 Datacenter Edition), handheld/embedded operating system software (Windows CE), Internet browser software (e.g., Internet

Explorer), software development tools (e.g., Visual Studio), server applications for client/server environments (e.g., Microsoft Exchange Server, Microsoft SQL Server), and office productivity suites (*e.g.,* Microsoft Office 2000, Microsoft Works).  Microsoft is engaged in, and its activities substantially affect, interstate and foreign commerce.

## III.    JURISDICTION AND VENUE

**21.**    This Court has jurisdiction over Sun's federal antitrust and copyright claims pursuant to 15 U.S.C. §§ 15 and 26, 17 U.S.C. §§ 501-05 and 28 U.S.C. §§ 1331 and 1337.  This Court has both diversity and supplemental jurisdiction over Sun's related claims under California law pursuant to 28 U.S.C. §§ 1332 and 1367.

**22.**    Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Microsoft transacts business in this district and is subject to personal jurisdiction in this district. In addition, a substantial part of the events or omissions giving rise to Sun's claims occurred in this district.

## IV.    INTRADISTRICT ASSIGNMENT

**23.**    Assignment to the San Jose Division of the Northern District of California is proper under Northern District Local Rule 3-2 because a substantial part of the events giving rise to this action occurred in Santa Clara County.

## V.    MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO THE INTEL-COMPATIBLE PC OPERATING SYSTEM MARKET

### A.    MICROSOFT'S MONOPOLY POWER

**24.**    Beginning in the early 1980s, vigorous competition emerged in the PC market with IBM's introduction of the PC with a microprocessor provided by Intel Corporation and an operating system (MS-DOS) provided by Microsoft.

**25.**    With one notable exception, the PC business has been marked by fierce competition at all levels.  Because the components necessary to make a PC are widely available, many companies compete to make and sell PC systems.  Because no PC manufacturer has been able to impose vendor-specific

interfaces for connecting peripherals like monitors, disk drives, and printers, "open" (not vendor-specific) standards have emerged, and, as a result, many different companies compete to make and sell PC peripherals. Because the information and interfaces necessary to write software applications to run on PCs were, in large measure, publicly available, substantial competition emerged to create software applications for PCs. Substantial competition even emerged in the market for supplying microprocessors for PCs as other companies competed with Intel by providing compatible microprocessors that could be substituted for Intel microprocessors.

26.     In stark contrast to such competition, Microsoft has maintained a monopoly share over the worldwide market for Intel-compatible PC operating systems for an extended period of time, and substantial barriers to entry protect Microsoft's monopoly. Because an operating system written for one class of microprocessors typically will not work on another class of microprocessors without significant modifications, PC manufacturers and PC users do not consider operating systems developed for non-Intel-compatible microprocessors to be effective substitutes for operating systems that run on Intel-compatible microprocessors.

27.     An operating system is a computer program that manages the resources and functions of the computer. In particular, the operating system controls access to and utilization of the microprocessor, system memory, and attached peripherals like monitors, printers, and storage devices. In addition, the operating system manages the execution of application programs on the computer.

28.     Operating systems act as a platform for software application development. An operating system contains libraries of thousands of different application programming interfaces ("APIs"). Rather than starting from scratch and writing an application that includes all of the code necessary to perform the desired functions, an applications developer can build his application on top of the underlying operating system by incorporating in his application "calls" to the APIs needed to instruct the operating system to perform many standard operations. For example, instead of re-writing the code necessary for printing a document or drawing a window on a screen, the developer simply calls the appropriate APIs.

**29.**    While Microsoft initially established its monopoly position through its MS-DOS operating system product, Microsoft anticompetitively maintained its monopoly during the transition from MS-DOS to its Windows operating system.

**30.**    Microsoft's Windows operating system was a response to the commercial success of Apple Computer's introduction of a graphical user interface as part of its Macintosh operating system. In order to copy this "user-friendly" experience for PCs while continuing to support existing MS-DOS applications, Microsoft built an application (Windows) that ran on top of MS-DOS and provided a graphical user interface. Windows also contained a new library of APIs that developers could use to write applications.

**31.**    Windows was thus originally "middleware" – a program that runs on top of an operating system and upon which other applications can be written to and run. By layering the Windows APIs on top of the pre-existing MS-DOS APIs, Microsoft permitted users to continue running their existing MS-DOS applications as well as run new Windows applications taking advantage of a newer, richer API set. Over a series of product iterations, Microsoft began to integrate the Windows middleware with the operating system, culminating in Windows 95, which fully integrated the Windows APIs with the underlying MS-DOS operating system. In short, Microsoft responded to the competitive threat posed by Apple's Macintosh operating system by using "middleware" to transition, yet maintain, its PC operating system monopoly.

**B.    THE ECONOMIC CHARACTERISTICS OF SOFTWARE DEVELOPMENT AND THE APPLICATIONS BARRIER TO ENTRY**

**32.**    One of the critical barriers to entry that has protected Microsoft's PC operating system monopoly, both in its MS-DOS and Windows incarnations, is the "applications barrier to entry."

**33.**    Because operating-system APIs differ from one operating system to another, an application developed to run on one vendor's operating system typically could not run on a different vendor's operating system (e.g., a Windows application would not run on Apple Computer's Mac operating system). Because an application might make tens of thousands of "calls" to operating-system-

specific APIs, it was and is extremely time-consuming and expensive to modify or "port" an application developed for one operating system to run on a different operating system. Developers therefore typically need to choose which platform will be targeted by any application that they write. Once a given application is written to target a given platform, developers also need to choose between writing another application or porting the existing application to a new platform.

34.      In making these choices, developers must take into account the fact that software development/porting requires high, up-front, fixed costs, while the marginal cost required to produce each additional copy is essentially zero. As a result, the average unit cost to produce each additional copy of a given application declines as more units are produced. In addition, prices not only decrease at a lesser rate than costs, but also, under the circumstances discussed below, prices actually may increase as volume increases. This economy of scale creates a strong incentive for developers to develop and distribute applications for the platform that has the largest market share. Once a given application is written to target a given platform, this economy of scale also creates a strong incentive for developers to devote their additional resources to writing new applications to run on that same dominant platform, rather than to porting the existing application to other platforms with lower market share.

35.      Similar economic principles guide the choices of consumers deciding which platform to purchase. A very large component of the value to a consumer of a given platform is the installed base of applications that have been written to run on that platform. The larger the installed base of applications, the more valuable the platform is to the consumer, and the higher the consumer's incentive to purchase that platform.

36.      These incentives of developers and consumers combine to create a perpetually reinforcing phenomenon referred to as the "positive feedback effect." Under the "positive feedback effect," developers have incentive to write their applications to the platform with the largest market share, which leads platform consumers to buy even more implementations of that dominant platform and thereby further increase its market share, which even further increases the incentives of developers to

write applications to that platform, etc.  This self-reinforcing cycle erodes the appeal of competing platforms and bars new vendors from entry into the market, irrespective of the merit and price of competing platforms.  Because of the critical role of software applications in this cycle, the "positive feedback effect" in the world of software development often is referred to as the "applications barrier to entry."

37.     The application barrier to entry has played a critical role in both creating and maintaining Microsoft's monopoly in PC operating systems.  When Microsoft's Windows operating systems gained majority market share, the incentives became overwhelming for developers to write most of their applications to run on Windows.  This increasing number of applications written to Windows increased the incentives of operating system consumers to select Windows over competing operating systems.  In turn, as these economic incentives led operating system consumers to further increase the market share of Windows, this increased market share caused developers to target an even higher percentage of their applications to run on Windows.

38.     This self-reinforcing cycle eroded the appeal of competing operating systems, and barred new vendors from effective entry into the market for PC operating systems, irrespective of the merit and price of competing operating systems.

39.     The barriers to competition protecting Microsoft's monopoly power in the PC operating system market increase as the costs to developers and consumers of "switching" to actual or potential substitute platforms increase.

40.     Developers who have written applications for one vendor's operating system face switching costs if they wish to "port" their application to run on another vendor's operating system.  Porting an application to run on a second operating system requires rewriting, debugging, and testing the computer code.  To maximize their potential return on investment, developers have strong incentives to develop the first version of their application for the operating system with the largest market share – Microsoft's Windows.  By differentiating its operating system from others through particular

13.

dependencies, Microsoft has further discouraged developers from porting their applications to other operating systems. The more Windows differs from competitors' systems, the more expensive it will be to port, and the less incentive developers will have to develop applications for competitors' operating systems. Unless a competing vendor's installed base of operating systems is sufficiently large to justify the cost of porting the application, developers will write their applications only for the dominant operating system – Microsoft's Windows – thereby intensifying the feedback effect.

41.    For consumers, switching costs provide a powerful economic incentive to acquire and continue to use the operating system that has the largest selection of applications and the greatest amount of developer interest, that is, the operating system with the largest market share. Switching costs can include far more than the cost of acquiring a new operating system. They can include, for example, the costs of acquiring or porting new applications, having new applications that are unable to work with existing applications, losing the ability to share newly created documents with users of the abandoned operating system, transferring data to the new applications, and training employees to use the new applications. So long as a consumer's cost of switching entails more than the cost of acquiring a new operating system, there is a strong economic disincentive for consumers to switch, even if competing operating systems are more efficient and lower-priced. If the cost of switching also entails the replacement or reconfiguration of devices connected with the computer, such as servers, printers or storage devices, the economic disincentive to switch is even greater.

42.    In order to protect its monopoly position, Microsoft has repeatedly acted to raise barriers to competition by adding dependencies to Microsoft products that increase switching costs for developers and consumers. By making it more costly for consumers and developers to switch away from its products, Microsoft has exploited its market power to forestall or prevent competition with its monopoly products.

43.    In the mid 1990s, Microsoft acted anticompetitively to raise or maintain barriers to competition from competing operating system vendors like Sun. Sun was and is a major vendor of high-

14.

performance desktop computers, known as workstations, and high-performance server computers. While the PC and workstation markets were initially distinct, the products became more substitutable throughout the 1990s as Intel-compatible PCs began to approach the performance of workstations from vendors like Sun. Faced with increasing competition from Intel-compatible PCs running Windows, Sun undertook a number of steps to compete with Windows.

44.    For example, Sun developed a version of its Solaris operating system that could run on PCs with Intel microprocessors in addition to running on Sun's workstations with Sun's Sparc microprocessors. Thus, if consumers valued the price of Intel-compatible PCs over the performance of Sun's Sparc workstations, they could still use a version of the Solaris operating system designed for Intel-compatible microprocessors. Faced with this direct competition from Sun in the Intel-compatible PC operating system market (as well as the workgroup server operating system market), Sun alleges, on information and belief, that Microsoft engaged in anticompetitive acts designed to threaten, discourage, or prevent computer OEMs from distributing the Intel-edition of the Solaris operating system.

45.    Since consumer demand for operating systems is substantially driven by the available applications for the platform, Sun attempted to ensure that key Windows applications could run or be easily ported to run on Solaris workstations and PCs. To provide users of competing operating systems with access to applications designed to run on the Microsoft Windows operating system, Sun developed an application called the Windows Application Binary Interface ("WABI"). WABI ran as "middleware" on top of a variety of Unix operating systems, including Sun's Solaris operating system for the Sparc microprocessor, Sun's Solaris operating system for Intel-compatible microprocessors, IBM's AIX operating system, and Hewlett Packard's HP-UX operating system. WABI translated an application's calls to the Windows operating system into calls to the underlying Unix operating system upon which it ran. Based on this translation technique, a user could purchase and run a Windows application like Microsoft Word on a Sun Sparc workstation running the Solaris operating system. In this way, a user could enjoy the ubiquity and familiarity of Microsoft applications without sacrificing

15.

such advantages as memory management, system administration and file backup resources provided by the Solaris operating system. Consumers were thus free to choose between a variety of operating systems that could run Windows applications, and the cost to consumers of switching between such operating systems would substantially decrease.

46.    Recognizing the threat posed by WABI to its applications barrier to entry, Microsoft engaged in anticompetitive conduct that impeded WABI's development and adoption, including, without limitation, the following acts. First, in order to forestall adoption and investment in WABI, Microsoft launched a program called Windows Interface Source Environment ("WISE") in which it licensed portions of the Windows source code to small firms such as Bristol Technology, Mainsoft Corporation, and Insignia Solutions to develop porting and emulation tools. Second, on information and belief, Microsoft designed, developed, and released new versions of the Windows operating system that were intentionally designed to make it more difficult for Sun to reverse engineer and implement the Windows APIs that were necessary in order for WABI to operate successfully. Third, when Sun sought to license source code from Microsoft in order to improve the accuracy or efficiency of WABI's translation and keep up with massive changes in subsequent versions of the Windows operating system, Microsoft refused to license Sun under commercially reasonable terms, even though it was willing to enter into such license agreements with other firms. Finally, when the competitive threat from WABI diminished because Sun's reverse engineering efforts could not keep pace with subsequent versions of Windows, Microsoft refused to renew or severely constricted its source code license with the WISE licensees, and insisted on the right to prevent the WISE licensees from sublicensing to firms that competed with Microsoft.

47.    The effect of Microsoft's anticompetitive conduct aimed and undermining Sun's ability to interoperate, and compete, with Windows was to foreclose competition in the PC and workgroup server operating system markets by ensuring that competing operating systems like Solaris could not be substituted for Windows without sacrificing the ability to run existing Windows applications. As a

result, Microsoft preserved the applications barrier to entry protecting its PC operating system monopoly and increased consumer lock-in by maintaining or raising the cost to switch to competing operating systems.

**C.    THE RISE OF THE INTERNET AND THE MIDDLEWARE THREAT TO MICROSOFT'S PC OPERATING SYSTEM MONOPOLY**

48.    Although the roots of the Internet can be traced back to as early as 1969, it was not until the early 1990s with the development of the World Wide Web ("the web") and graphical web browsers that usage fundamentally and dramatically expanded.

49.    The goal of the Internet was to create a network over which different computers based on different operating systems and communications protocols could nonetheless connect and interoperate with each other.  At its inception, the Internet was a public project based on open standards and protocols that were not vendor-specific.  The development of standard communication protocols like TCP/IP and HTTP allowed networked communications between unknown, untrusted, heterogeneous computers around the world.

50.    As Internet connections became ubiquitous, every computer, even a home PC, became a networked computer.  Moreover, networks were no longer just closed, vendor-specific networks within a particular enterprise.  Instead, enterprises increasingly began to communicate and interoperate with one another across the Internet.  The ability to access the information and services offered over the Internet made PCs much more valuable to consumers than when PCs could be operated on only a standalone basis.  The Internet promised compelling new applications such as email, e-commerce, or streaming video and audio, which simply could not be offered on a Windows PC that was not connected to a global network.

51.    This ability to interoperate between different computer platforms connected to the Internet using open interfaces and standards created a significant opportunity for consumers and developers.  If applications could be delivered using these open interfaces and standards, or a standard API layer could be built upon those interfaces and standards, consumers and developers would no longer

be locked into purchasing or writing applications written for a specific operating system.  Instead, applications could be written to a common "middleware" platform that every computer connected to the Internet could run.

52.     The development of a "middleware" Internet platform threatened to reduce the applications barrier protecting Microsoft's monopoly power in PC operating systems.  Since consumers could use these new applications without giving up their existing applications, switching costs associated with adopting the new "middleware" platform would be significantly reduced.  Just as Microsoft was able to use a "middleware" version of Windows to gradually transition its MS-DOS users to a new platform, competitors could use a "middleware" Internet platform to transition users away from Microsoft Windows operating system, without requiring the users to give up their existing applications. Once developed, this new platform also would promote competition in the operating systems market because applications would be available across multiple platforms and would not be dependent upon the presence of a specific operating system.

53.     By 1995, the emergence and rapid success of the Netscape Navigator web browser and Java platform suggested that the idea of alternative platforms for harnessing these applications was far more than a theoretical possibility.  Microsoft immediately perceived the threat that these new middleware platforms posed to its PC operating system monopoly, and began its campaign of illegal acts to attack these alternatives.

54.     Within months of its release, Navigator achieved a dominant share of the new market for web browsers, which allowed users to locate, access, display, and manipulate information and applications located on the web.  Increasingly, web browsing became one of the primary activities for PC users.

55.     Because Netscape had "ported" its browser across many different platforms (e.g., Windows, Macintosh, Solaris) and was, in effect, a middleware platform to which many applications could be written, Microsoft's Windows monopoly was directly threatened by this nascent platform.  As

Bill Gates warned his executives in 1995:

> "A new competitor 'born' on the Internet is Netscape. Their browser is dominant, with a 70% usage share, allowing them to determine which network extensions will catch on. They are pursuing a multi-platform strategy where they move the key API into the client to commoditize the underlying operating system." (Exhibit A).

**56.**   Through a series of anticompetitive acts designed to restrain the emergence of the alternative platform and maintain its monopoly in PC operating systems, Microsoft effectively pushed Netscape out of the web browser market.

     **D.**   **MICROSOFT'S ANTICOMPETITIVE ACTS AGAINST THE JAVA PLATFORM**

**The Features and Attributes of the Java Platform**

**57.**   In 1995, Sun designed, created and introduced the Java platform. The Java platform provides an elegant solution for developing applications in heterogeneous network environments because applications written for the Java platform are portable across many different, otherwise incompatible, operating systems. As a platform that could run across a variety of devices and operating systems, the Java platform was ideal for developing applications for the Internet. In addition, the Java platform was attractive to developers because versions of the platform could be scaled to run from small devices like telephones and smart cards to powerful server computers.

**58.**   The Java platform is comprised of (a) the Java programming environment and (b) the Java runtime environment.

**59.**   The Java programming environment consists of the components a developer uses to write an application to be executed in the Java runtime environment: (a) the Java programming language; (b) the Java compiler; and (c) the Java class libraries. The Java programming language is a general-purpose, object-oriented programming language specified by a well-defined grammar. The Java compiler is a tool that translates programs written in the human-readable source code for the Java programming language into computer-readable bytecode instructions understood by the Java virtual machine. The Java class libraries implement the set of standard Java APIs (commonly used functions)

that are available to programmers writing applications for the Java platform.

60.    The Java runtime environment consists of the components that must be present in order to run a Java-based application: (a) Java virtual machine and (b) Java class libraries. The Java virtual machine interprets the Java bytecode instructions and executes the code as appropriate for the particular operating system on which that Java virtual machine resides. The Java class libraries also must be present because these libraries include code that implements the core APIs that the Java-based applications will call when they run.

61.    The Java runtime environment creates a common, standardized layer above the operating system, to which programmers can write applications. By writing applications to this standardized "middleware" layer that is identical across every systems platform that implements a Java runtime, a software developer can significantly minimize, if not entirely eliminate, the work necessary to ensure that the same program will run on multiple platforms.

62.    From the bottom-up, the Java platform was designed to be "object-oriented" and support "distributed computing." "Object-oriented" programming refers to a process in which applications are assembled from different "components" or "objects," each of which is itself a separate, discrete function capable of performing a particular task. This design feature substantially improves developer productivity because it allows applications to be assembled more quickly with fewer errors.

63.    "Distributed computing" refers to a computing model in which different components or objects can be executed on different computers on a network. For example, part of an email program might execute on a user's PC and another part on a server computer. Distributed computing enhances the efficiency of a network, and promotes the availability of data and applications regardless of location or device. As the number of devices connected to the Internet grows and the speed of their network connections rises, applications are increasingly distributed across multiple machines on the network. These new kinds of distributed applications, called "web services," are transforming the computer industry, and the Java platform has been the platform of choice upon which to build such web services

applications.

64.     Because the Java platform was designed to operate in a network environment, it also contains important security innovations. Java-based applications run in a security "sandbox." Thus, if a user encounters a web page that downloads a Java-based application (called an "applet"), the security sandbox is designed to prevent execution of applications that contain malicious code like viruses, or poorly written code that might access memory not allocated to its process. For example, before a Java-based application is run, the downloaded bytecode is "verified" to ensure it is not seeking to perform any illegal operations. In addition, a Java security manager performs runtime checks on programs to ensure that illegal or dangerous calls are not made, and can grant more access if the Java bytecode is from a trusted source.

65.     Because Sun appreciated that the Java platform was still evolving and might need to interact with existing code that was not written in the Java programming language, Sun developed an interface called the Java Native Interface (JNI), which allows Java code to interact with code written in another programming language, such as C++.

**Licensing**, **Compatibility**, **and Control of the Java Platform**

66.     Sun's licensing model for the Java platform was just as threatening to Microsoft, if not more so, than the underlying technology itself. Sun widely licensed the Java platform to many different vendors in order to create a competitive market in which vendors could compete on price and performance while maintaining common standards in much the same way as PC manufacturers compete today. In other words, Sun chose to create a market which was not shielded by an application barrier to entry, since any vendor who implemented the Java platform in a compatible manner could offer its customers the ability to run all Java-based applications. The "positive feedback effect" surrounding the Java platform would benefit all competitors equally, not just Sun.

67.     Since its release in 1995, the source code for the Java platform has been widely licensed by Sun to competing vendors in order to encourage the rapid and widespread adoption and compatible

implementation of the Java platform on as many operating systems and browsers as possible, and thereby foster the development of a competitive market for such products. The Java platform has been the most rapidly adopted programming environment in the history of the software industry.

68.    To ensure that Java-based applications would run across the wide variety of operating systems and browsers that support the Java platform, Sun had to first develop and carefully define a standardized application programming environment through specifications and standard API libraries. Then it licensed the Java platform source code to independent software vendors, systems manufacturers and browser developers who agreed to implement the Java platform in their respective applications, operating systems or browsers. Equally important, Sun secured the firm agreement and mutual commitment of each party implementing the Java platform that the party would implement the Java platform following the specifications and API definitions in a consistent, compatible manner.

69.    Compatibility was and is critical to the commercial value and competitive appeal of the Java platform. So long as each platform licensee compatibly implements Sun's specifications in its version of the platform, a Java-based application will execute as intended on that platform and every other compatible Java platform. Compatibility increases the economic incentive of developers to create applications for the Java platform, because the potential market for their application is only as large as the number of compatible Java platforms. The larger the number of platforms on which their application can run, the greater and faster the economic return such developers can earn on their investment in such applications.

70.    Compatibility also reduces barriers to competition by reducing the cost and burden to consumers of switching from one systems vendor to another. Rather than port each application from their old system to a new system, and retrain their work force to use the new applications on the new system, consumers that use the Java platform can switch underlying systems with significantly reduced costs to port or switch their Java-based applications from their old system to a different system.

71.    Since compatibility could be maintained only if each licensee agreed to maintain

compliance with Sun's set of specifications and APIs over time, Sun contracted with each licensee, including Microsoft, to obtain the licensee's commitment to maintain compatibility. In addition, Sun published detailed specifications and provided licensees comprehensive compatibility test suites for the Java platform to test whether their respective application, operating system or browser in fact maintained compatibility.

72.     Because so much of the value of the Java platform rests on the ability of programmers to rely on a standardized application programming environment across different platforms, it was critical that all licensees maintain compliance with these specifications and APIs. If any licensee broke compatibility, particularly if its implementation had significant market share, the utility and value of the Java platform would be substantially diminished for all. This, in turn, would render the Java platform commensurately less attractive as a platform to which developers would target their applications.

73.     In stark contrast to Microsoft's practices relating to Windows, Sun licenses the source code for the Java platform to a large number of runtime and tools vendors, as well as applications developers and operating system and browser vendors. Given Sun's open licensing policies, the Java platform was and is vendor-independent. For example, Sun has developed and distributed an implementation of the Java runtime, but so have many other licensed vendors, including IBM, Novell, Oracle, BEA Systems, Borland, and Webgain. Thus, consumers can substitute any licensed vendor's runtime for those distributed by any other licensed vendor, and still continue to execute their pre-existing Java-based applications with little or no switching cost.

74.     Because the same Java-based application can run on all Java runtimes, consumers are free to choose the fastest, the cheapest and/or the most versatile Java runtime available for their needs, with the assurance that their existing Java applications will execute properly on whatever runtime they choose. Similarly, developers are free to choose the most productive toolset, or the cheapest, with the assurance that the applications they develop using that toolset will execute properly on any licensed Java runtime they may install.

**75.** Although Sun has retained its ownership and intellectual property rights relating to the Java platform, the development and approval of technology specifications, reference implementations, and compatibility test suites for the Java platform are managed by an open organization of Java developers and licensees known as the Java Community ProcessSM ("JCP"). Anyone can join and participate in the JCP. Two Executive Committees, each consisting of 16 members, represent major stakeholders and the community of developers and others who have adopted the Java platform (the "Java community"). These Executive Committees approve the passage of specifications and reconcile discrepancies between the specifications and the compatibility test suites. Current members include, among others, representatives from Apple, BEA Systems, Borland, Cisco, Compaq, Hewlett-Packard, IBM, and Oracle. Members of the Executive Committees are elected by the Java community. Although Sun has a permanent seat on the Executive Committees, Sun does not control the process. As a result, changes to the Java platform are subject to the JCP's approval, not Sun's. Sun has invited Microsoft to join the JCP, but Microsoft has refused to do so.

**Microsoft Believed the Java Platform Threatened Its PC-Operating System Monopoly**

**76.** The Java platform posed a threat to Microsoft's monopoly. Since a Java runtime could be developed for many operating systems (e.g., Windows, Mac OS, Solaris, Linux), applications written for the Java platform could run on all major operating systems, expanding the potential market for the developers' applications. Unlike existing vendor-specific platforms (e.g., Microsoft Windows, Apple Mac OS), the Java platform would span across those platforms, aggregating all of those users into an even larger installed base that software developers could economically target.

**77.** Consequently, the Java platform was highly appealing to independent software developers, because it provided an opportunity for them to earn a larger and faster economic return on their application development than other competing platforms, such as Microsoft's Windows platform. Since an application developed for the Java platform could be distributed for every device that compatibly implemented the Java platform, the potential market for such applications included all

desktop computers, not just Windows PCs.

78.     The Java platform also offered developers the ability to create and deploy secure,
Internet-enabled distributed applications that could execute partly on desktop computers and partly on
other networked devices, such as server computers, cell phones, PDAs or other handheld devices.  In
addition, the advanced features of the Java platform made distributed application development
significantly more efficient and less error-prone, thus providing significant productivity gains for
software developers.

79.     Once commercially useful Java applications were developed, consumers could choose to
replace the underlying operating system and still be able to utilize their existing Java applications with
little or no switching cost, so long as the new operating system also supported the Java platform. The
ability to substitute a competing operating system without incurring the high cost associated with
switching applications was a major benefit for consumers, and a direct threat to Microsoft's continuing
ability to maintain its monopoly.  If applications were increasingly written as Java applications,
consumers could even substitute competing operating systems made for non-Intel-compatible desktop
operating systems such as Sun's Solaris operating system or Apple's Macintosh operating system
because applications would not be tied to a particular operating system or microprocessor.  In addition,
where fast network connections exist, consumers could run Java applications from a server, and
substitute "thin-client" network computers/terminals for the "fat-client" Intel-compatible PCs currently
running Windows.

80.     The Java platform thus threatened to dissipate or eliminate the anticompetitive effects of
the application barrier to competition in the PC operating system market, as well as the interoperability
barrier in the workgroup server market, by reducing the cost of switching from one desktop or
workgroup server operating system to another.  By including a compatible Java implementation with
their operating system or browser, Microsoft's competitors could afford consumers and developers the
ability to switch their competing operating system or browser for Microsoft's Windows operating

system or Internet Explorer browser, while continuing to use the existing base of Java applications with little or no switching cost. If enough applications were written for the Java platform, Microsoft realized that the dominance of Windows could wane as the positive feedback effect of operating system dependency was eliminated.

81.    The potential benefits to Sun's business were substantial. To the extent that desktop and server applications were written to run on the Java platform, instead of the Windows operating system, the utility of and demand for Sun workstations and servers would increase. As more applications were developed for a Java platform, the applications barrier protecting Microsoft's dominance in the PC operating system and the workgroup server operating system markets would decrease, and the potential for competition would increase. In such a competitive marketplace, there would be greater substitutability across operating systems and microprocessors as a result of the Java technology. For example, consumers could substitute Sun workstations with the Sparc microprocessor and Solaris operating system for desktop computers with the Intel-based microprocessor and Windows operating system, and still run the same applications. Similarly, there would be greater substitutability between Sun's Solaris-based servers and Windows-based servers. By exposing Microsoft's PC operating system monopoly to competition, the Java platform afforded Sun the opportunity for greater revenues and higher profits across its entire business.

82.    Soon after the announcement of Sun's Java technology licensing program, senior Microsoft executives quickly perceived the Java platform as a substantial threat to its monopoly position:

- In February 1996, Microsoft Executive Vice-President Paul Maritz asserted that "Netscape/Java is using the browser to create a 'virtual operating system'" that threatens to render Windows "devalued, eventually replaceable." (Exhibit B).

- In September 1996, Microsoft Chairman and CEO Bill Gates wrote that the Java technology "scares the hell out of me" because "[i]ts [sic] still very unclear to me what our OS will offer to Java client applications code that will make them unique enough to preserve our market position." (Exhibit C).

- In December 1996, Microsoft executive John Ludwig worried that Microsoft had "lost the attention of the leading edge" of the software

development industry because "Java is the next big industry-transforming idea" and that "if we don't come up with a compelling business case for the industry fast, which we can back up with credible technology, then we are going to face 4-5 years at least of being the (increasingly) 2[nd] tier platform vendor."  (Exhibit D).

83.     To neutralize the threat posed by the Java platform, Microsoft, at the direction of Bill Gates, devised plans to "wrest control of Java away from Sun" and "turn Java into just the latest, best way to write Windows applications."  (Exhibit E).

84.     Microsoft's anticompetitive scheme was as follows:  (a) secure access to the Java platform from Sun with contractual pledges of compatibility; (b) fragment the Java platform by breaching Microsoft's contractual pledges of compatibility; (c) flood the market with Microsoft's incompatible implementation of the Java runtime; (d) contractually force others to distribute and use "polluted" Java applications and runtimes; (e) use exclusionary agreements and coercion to foreclose Sun's alternative channels for distribution or development of compatible Java runtime implementations; and (f) interfere with the development of Java-based applications for compatible runtimes.

**Microsoft Gained Access to Java Technology from Sun by Promising Compatibility**

85.     To effectuate this anticompetitive scheme, Microsoft first needed access to the Java technology, so it entered into a license agreement with Sun in March 1996.  In exchange for access to the source code for the Java technology and the right to make and distribute products incorporating the Java technology, Microsoft agreed, among other things, to refrain from distributing products unless they passed Sun's compatibility test suites.  The compatibility tests were designed to ensure that all implementations conformed to Sun's published specifications and "public" APIs.

86.     But even while it appeared to be publicly embracing the Java technology, in private Microsoft executives planned to "kill cross-platform Java by grow[ing] the polluted Java market." (Exhibit F).

**Microsoft Fragmented the Java Platform**

87.     Microsoft knew that the critical next step in executing this plan was to create

implementations that deviated from and were incompatible with the standard Java programming environment, the very standard that Microsoft had committed to adhere to in its agreement with Sun. By fragmenting the Java platform into two, incompatible environments, Microsoft hoped to recreate its applications barrier and force developers and consumers to choose the environment that had the largest installed base: Microsoft's environment. As Microsoft's Senior Vice President Jim Allchin put it: "I would explicitly be different – just to be different. . . . [W]ithout something to pollute Java more to Windows (show new cool features that are only in Windows) we expose ourselves to more portable code on other platforms." (Exhibit G).

      88.    To fragment the Java platform, Microsoft breached its contractual obligations to Sun by developing a Java runtime with strategic incompatibilities that differed from all other licensed Java runtime implementations in ways that rendered the applications developed for its implementation tied to and dependent on Microsoft's incompatible implementation. For example, Microsoft refused to support JNI – the standard interface for allowing Java code to interact with native code written in a different language. Instead, Microsoft forced developers to use its incompatible alternative called RNI by supporting only that interface in Microsoft's version of the Java runtime.

      89.    Taking advantage of its monopoly position, Microsoft bundled its incompatible implementation of the Java runtime into a plethora of products, including its Windows operating system and Internet Explorer browser, ensuring that its incompatible runtime would achieve a larger market share than all other Java runtime implementations. According to the head of Microsoft's Java development team, "Distribution (w/Windows)" was a key point of leverage for Microsoft because it wanted to "[d]rive MS Java VM and classlibs (w/Win32 extensions!) to a broad installed base" and "encourage fragmentation of the Java [class library] space" in order to ensure that "write once, run everywhere does not happen." (Exhibit H).

      90.    Microsoft further fragmented the Java programming environment by introducing incompatible extensions to the Java programming language in its development tools for the Java

platform, such as Visual J++, that caused Microsoft's corrupted versions of the Java compilers to produce output that would run properly only on Microsoft's Java runtime, and not on any others, including those of Sun or its other licensees. These changes not only were strategically designed to break compatibility, but were also designed to favor the Microsoft-specific distributed object model – COM/COM+/DCOM – over the Java standard – JavaBeans/RMI. Microsoft's corrupted Java tools deceptively generated incompatible code that worked with this Microsoft-specific object model. Moreover, Microsoft refused to ship the code that implemented RMI with its development tools, and instead required developers to try to search out and separately download RMI from Microsoft's website in order to discourage its use. Microsoft's incompatible extensions also were developed to encourage software developers to directly "call" the Windows platform (i.e., Win32 APIs) rather than Java APIs, ensuring that applications written using Microsoft's polluted extensions would run on only Microsoft's platforms.

91.     According to the head of Microsoft's Tools Division, Paul Gross, the "true goal" of Microsoft's language extensions was "controlling the future of Java." (Exhibit I). Or as a colleague of Mr. Gross put it more bluntly, "Screw Sun, cross-platform will never work. Let's move on and steal the Java language." (Exhibit J).

92.     Part of Microsoft's strategy was to conceal from developers and consumers the Windows-dependencies built into Microsoft's implementations of the Java platform, in the hopes that would-be cross-platform developers would unwittingly become dependent on Windows. As Microsoft executive Thomas Reardon wrote in November 1996,

> "at this point its not good to create MORE noise around our win32 Java classes, instead we should just quietly grow j++ share and assume that people will take more advantage of our classes without ever realizing they are building win32-only Java classes." (Exhibit K).

Similarly, Microsoft Vice President John Ludwig believed that concealment of Microsoft's plans would give Microsoft a competitive advantage over Sun and its other licensees:

> "subversion has always been our best tactic . . . subversion is almost

invariably a better tactic than a frontal assault . . . it leaves the competition
confused, they don't know what to shoot at anymore." (Exhibit L).

**Microsoft Flooded the Market with Incompatible Implementations of the Java Runtimes**

93.    After developing its incompatible implementation, Microsoft used its massive
distribution channels to flood the marketplace with its corrupted implementation. Because Microsoft
incorporated its version of the Java runtime into both Internet Explorer 4.0 browser and Windows 98
operating system, every new PC containing Windows 98 and every PC that downloaded Microsoft's
then-latest browser contained Microsoft's incompatible implementation of the Java runtime. In addition,
Microsoft bundled the incompatible runtime with its software development tools and countless other
software products, including Microsoft Office and Microsoft Money.

**Microsoft Forced Others to Distribute or Use Its Incompatible Products**

94.    Microsoft not only exploited its Windows monopoly to flood the market with
incompatible implementations, it also exploited its monopoly power to extract exclusive dealing
contracts with independent software vendors (ISVs) that required ISVs like Aimtech Corp., Seagate
Software, and Tower Technologies to use or distribute Microsoft's incompatible products exclusively,
preferentially, or by default.

95.    Microsoft also entered into agreements with other companies, including Hewlett-Packard
Transvirtual Technologies, and Rational Software, in order to induce those companies to develop
"clones" of the Java technology that support Microsoft's incompatible language extensions.

**Microsoft Foreclosed Sun's Alternative Channels for Distribution of the Java Runtime**

96.    In May 1995, Netscape, a licensee of Sun's Java technology, agreed to include an
implementation of the Java runtime with every copy of Navigator, Netscape's web browser. Navigator
quickly became the principal vehicle by which Java runtimes were distributed to Windows users. Given
Netscape's significant market share at that time, it appeared that the Java runtime would achieve
ubiquitous distribution on Windows systems as a result.

97.    Microsoft executives viewed Netscape's distribution of a Java runtime as significantly

increasing the threat that Netscape's combined browser/Java runtime would diminish Microsoft's application barrier and cause Microsoft to lose its monopoly power.

98.    Microsoft's anticompetitive actions directed against Netscape's Navigator browser thus were, in significant part, undertaken to close a primary distribution channel for Java runtimes for Windows, which otherwise would not have been controlled by Microsoft.  Among others, those anticompetitive acts included:

- In its Windows license agreements with Original Equipment Manufacturers (OEMs), Microsoft imposed a series of restrictions that unlawfully thwarted the distribution of rival browsers like Navigator in favor of Microsoft's Internet Explorer;

- Microsoft unlawfully excluded Internet Explorer from the Windows Add/Remove Programs utility and commingled browser and Windows operating system code;

- Microsoft entered into exclusionary contracts with Internet Access Providers (IAPs) that severely restricted Netscape's access to a key, efficient distribution channel for browsers;

- Microsoft entered into "First Wave" agreements with ISVs that conditioned early access to critical information for Windows on the ISV's use and distribution of Internet Explorer;

- Microsoft used threats and intimidation to force Apple to bundle Internet Explorer with its Macintosh operating system as the default browser.

99.    As a direct result of these actions, Netscape's share of the browser market rapidly plummeted, dramatically decreasing Sun's ability to promote the distribution of Java runtimes on Windows systems, and restricting opportunity in the market for buyers to choose innovative alternative browser software.  Furthermore, Microsoft's actions significantly contributed to Netscape's decision in 1998 to cease developing its own implementations of the Java runtime.

100.    As found and affirmed in United States v. Microsoft, Microsoft's anticompetitive actions directed at Navigator foreclosed a substantial portion of the field for the distribution of Sun's Java runtimes through distributors other than Microsoft, thus preventing Sun from achieving the necessary

ubiquity on Windows.  Alternative distribution channels that would provide a necessary level of access to end users were not available.

**Microsoft Unreasonably Restrained Trade By Intentionally Interfering with the Development of Java-Based Applications for Compatible Runtimes**

101.    Microsoft engaged in efforts to pressure Intel Corporation, another licensee of the Java technology, from developing a high-performance Windows-compatible implementation of the Java virtual machine, effecting a boycott against the production of compatible Java virtual machine implementations by two of the PC industry's largest players.  Microsoft also pressured Intel not to develop multimedia support for the Java platform to further restrain the Java platform's ability to compete with the Windows platform.

102.    Similarly, Microsoft entered into an agreement in July 1997 with RealNetworks, a developer of popular software for the creation and playback of streaming multimedia content, conditioning Microsoft's distribution of the RealNetworks' media player on RealNetworks' agreement to exert its best efforts to ensure that its player primarily uses Windows-specific technology, rather than analogous interfaces that Sun or Netscape might develop.

103.    In 1997, Apple Computer was in steep decline, and many doubted whether the company would survive.  One of the leading applications for Apple's Mac operating system was Microsoft's Mac Office, a suite of business productivity applications.  As of 1997, approximately 90% of Mac operating system users running an office productivity suite used Microsoft's Mac Office.  Recognizing the critical importance to Apple of its continued support of Mac Office, Microsoft threatened to cancel its Mac Office product in order to coerce Apple into supporting Microsoft's Internet Explorer browser and polluted Java runtime implementation.

104.    Within a month of that threat, Apple and Microsoft entered into an agreement that conditioned Microsoft's support for Mac Office on Apple's agreement to bundle Microsoft's Internet Explorer with the Mac operating system, and to make Internet Explorer the default browser.  In addition, Apple was precluded from positioning icons for Netscape's Navigator on the desktop for new Macintosh

systems or Mac operating system upgrades. Furthermore, the agreement prohibited Apple from encouraging users to substitute another browser, and required Apple to encourage its employees to use Internet Explorer. Finally, the agreement required Microsoft and Apple to collaborate on the development of Java runtime implementations for the Mac operating system, and required Apple to adopt Microsoft's non-conforming J/Direct interfaces for calling native functionality from its Java runtime.

105.    By agreements with these and other key systems vendors, Microsoft intended to restrain the development, distribution, and trade of an alternative applications platform – the Java platform – that competed with Microsoft's Windows platform. The effect of Microsoft's campaign was to restrain trade, without any procompetitive justification.

**Anticompetitive Acts To Interfere with Development and Distribution of Java Platform in Other Markets**

106.    Not only has Microsoft attempted to prevent the development and distribution of the Java platform on PCs, it also has taken steps to interfere with the development and distribution of the Java platform in adjacent markets. Since the Internet is increasing connectivity between formerly independent devices, Microsoft appreciated that the success of the Java platform in these adjacent markets indirectly threatened its PC operating system monopoly as well.

107.    For example, Sun has licensed the Java platform for use in television settop boxes for the cable industry. On information and belief, Sun alleges that Microsoft has used a combination of threats and "investments" to ensure that certain cable companies and settop box manufacturers do not distribute the Java platform. In addition, on information and belief, Sun alleges that Microsoft threatened to delay shipment of Windows to certain settop box manufacturers who also manufactured PCs if they agreed to distribute the Java platform in their settop boxes.

**Sun v. Microsoft I and Settlement Agreement**

108.    On October 7, 1997, in order to preserve the integrity of its Java platform, Sun was forced to sue Microsoft in the United States District Court of the Northern District of California. *See*

*Sun Microsystems, Inc. v. Microsoft Corp.*, No. C 97-20884 RMW (PVT).  During the course of that

action, Sun asserted claims against Microsoft for breach of contract, copyright infringement, trademark

infringement, and unfair competition.

**109.**    Over the course of that litigation, the Court granted a series of preliminary injunctions

against Microsoft enjoining Microsoft from (1) using Sun's Java Compatible™ logo, (2) distributing

Microsoft products that incompatibly implemented the Java technology such as Internet Explorer and

Windows 98 and failed to pass Sun's compatibility tests, and (3) falsely advertising that its products

complied with the specifications for the Java technology, or that Sun endorsed its products.  *See Sun*

*Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301 (N.D. Cal. 1998); *Sun Microsystems, Inc. v.*

*Microsoft Corp.*, 21 F. Supp. 2d 1109 (N.D. Cal. 1998), *vacated and remanded*, 188 F.3d 1115 (9th Cir.

1999); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992 (N.D. Cal. 2000); *Sun*

*Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026 (N.D. Cal. 2000) (collectively "*Sun v.*

*Microsoft I*").  As a result, Microsoft was required to modify its products to remove certain strategic

incompatibilities in order to comply with the injunctions.

**110.**    On January 23, 2001, Sun and Microsoft entered into a Settlement Agreement and

Mutual Limited Release ("Settlement Agreement") with respect to Sun Microsystems, Inc. v. Microsoft

Corp., No. C 97-20884 RMW (PVT).  A true and correct copy of the Settlement Agreement (without

attachments) is attached hereto as Exhibit M.

**111.**    As part of the Settlement Agreement, Microsoft, among other things, agreed to pay Sun

$20 million.  The parties also granted each other limited mutual releases for "such claims and

counterclaims as each party has against the other based upon the acts or omissions of either party prior

to the date of this Agreement that were the subject of this Action."  (See Settlement Agreement, ¶ 17(a)).

However, the Settlement Agreement specifically provided that Sun did not release any of its "claims

arising under antitrust laws it may have against Microsoft."  (See id., ¶ 17(b)).

**112.**    As part of the Settlement Agreement, Sun terminated Microsoft's prior licenses to the

Java technology, and granted Microsoft a new limited license.  Under Section 6(a) of the Settlement

Agreement, Sun granted Microsoft a license "to continue to distribute without modification in currently

shipping commercial products, all as listed on Exhibit D attached, the JDK 1.1.4-level binary

implementations identified in Exhibit E attached, but only insofar as such binary implementations do not

alter or add in any way to the functionality and features of the JDK 1.1.4-level binary implementation

that was present in the Windows 2000 First Commercial Release."

     **113.**    In addition, under Section 6(c) of the Settlement Agreement, Sun granted Microsoft "a

limited license . . . to incorporate the JDK 1.1.4-level binary implementations licensed under paragraphs

6(a) or 6(b) above in successor versions of the products identified in Exhibit D . . ., but only insofar as

such modified implementations and products satisfy the limitations set forth in paragraph 7 below."

Under Section 6(d), "[s]ubject to and conditioned on Microsoft's compliance with all of the provisions

of paragraph 7(c)," Sun also granted Microsoft "a limited license under Sun's Intellectual Property

Rights . . . to distribute the products identified in paragraph 6(c) above, but only insofar as such products

satisfy the limitations set forth in paragraph 7 below."  The reason Microsoft's incorporation license in

paragraph 6(c) is limited to successor versions of products, as distinct from copies of successor products,

was to ensure that the Microsoft Virtual Machine for Java would either be preinstalled in each copy of a

new product version, or not distributed for such products at all.  If Microsoft's Virtual Machine for Java

were incorporated in a successor version of a licensed product, then every customer who purchased that

product version would receive it preinstalled.  If it were not incorporated by Microsoft in that product

version, then no purchaser of that product could obtain it from Microsoft.  Instead, those customers

would be motivated to obtain a current, compatible Java runtime from Sun or its other licensees.

     **114.**    Section 7 of the Settlement Agreement specifies that "[t]he basic intent of the licenses

granted  . . . is to permit Microsoft to continue to distribute its current products 'as is.'"  Section 7(a)(v)

provides that the limited license granted by Sun expressly excludes any right by Microsoft to develop or

distribute a product that "[a]lters the manner in which any binary implementation licensed under

paragraph 6 is integrated with any other technology relative to the manner in which the pre-existing

Windows 2000 FCR 1.1.4 binary implementation (as modified in accordance with the Delta List

attached as Exhibit F) is integrated with any other technology."

**Microsoft's Decision to Exclude the Microsoft Virtual Machine for Java from Windows**

     **115.**    Prior to signing the Settlement Agreement, Microsoft had incorporated its

implementation of the Java runtime – the "Microsoft Virtual Machine for Java" – into prior versions of

its Windows operating system products (e.g., Windows 2000, Windows Me, Windows 98) and Internet

Explorer browser.

     **116.**    In October 2001, Microsoft began commercially distributing its Windows XP operating

system.  Unlike prior versions of the Windows operating system, Windows XP did not include the

Microsoft Virtual Machine for Java.  Instead, unless PC manufacturers separately installed a Java virtual

machine, the first time that a consumer running Windows XP encountered an application or web page

requiring a Java virtual machine, Windows XP would generate a notice that in order to execute the

application or display the web page correctly, the user must download and install the Microsoft Virtual

Machine for Java.  If the consumer then selected "Download," the user was automatically directed to a

Microsoft web site from which the Microsoft Virtual Machine for Java was downloaded and installed.

     **117.**    As a result, any consumer who purchased a PC with Windows XP could not execute

Java-based applications or access Java applets contained on millions of web pages without first engaging

in a time-consuming download of the Microsoft Virtual Machine for Java.  In addition, after forcing

consumers who desired the Java platform to engage in a time-consuming download, Microsoft ensured

that consumers would receive Microsoft's obsolete implementation of the Java platform, instead of a

current, compatible implementation of the Java platform.

     **118.**    Sun has notified Microsoft of its unlicensed distribution of its Virtual Machine for Java

for Windows XP outside the scope of any license granted in the Settlement Agreement, and has

demanded that Microsoft effect a cure of its unlicensed distribution.  To date, Microsoft has failed to

effect a cure.

119.    Sun is informed and believes that Microsoft has recently ceased distribution of the Microsoft Virtual Machine for Java via Internet download.  However, Microsoft continues to separately distribute copies of the Microsoft Virtual Machine for Java to PC OEMs, authorizing them to incorporate it into Windows XP.  Such distribution also exceeds the scope of Microsoft's limited license under the Settlement Agreement.

120.    Sun is informed and believes that Microsoft will shortly begin to distribute the Microsoft Virtual Machine for Java in an upcoming service pack for Windows XP.  A service pack is not a successor version of the Windows operating system, and any such distribution also will exceed the scope of Microsoft's limited licenses in the Settlement Agreement.

121.    Microsoft's Unlicensed Distribution of Sun's Copyrighted Work

122.    Microsoft developed the Microsoft Virtual Machine for Java using copyrighted source code from Sun's Java Development Kit ("JDK") software program, which Sun had provided to Microsoft pursuant to the terms of its original license agreement with Microsoft.  As previously shown in Sun v. Microsoft I, the source code for the Microsoft Virtual Machine for Java contains tens of thousands of lines of source code directly copied from the source code of Sun's JDK, as well as tens of thousands of lines of code derived from Sun's copyrighted code.

123.    Because Microsoft is neither distributing the Microsoft Virtual Machine for Java in a commercial product identified in Exhibit D of the Settlement Agreement, nor distributing it in a successor version of such products, Microsoft's distribution is outside the scope of the limited license granted the Settlement Agreement.

E.    **MICROSOFT'S ANTICOMPETITIVE ACTS AGAINST LINUX**

124.    Recently, Sun also has begun to directly compete with Microsoft in the Intel-compatible PC operating system market (as well as the workgroup server operating system market) with a version of the Linux operating system that can run on Intel-compatible microprocessors.  Sun will soon begin

distributing the Linux operating system as part of its Java Desktop System for use on Intel-compatible PCs.  Sun also has distributed the Linux operating system with certain entry level Intel-compatible servers that Sun sells.  In addition, Sun has developed and sold a variety of software applications for the Linux operating system, including its StarOffice office productivity suite.

125.    Developed by thousands of programmers collectively around the world and distributed by Sun and others pursuant to an open source license, Linux has rapidly become a competitive threat to Microsoft's dominance of the PC and workgroup operating system in recent years.  On information and belief, Microsoft has recognized the threat posed by Linux to the applications barrier to entry, and has engaged in anticompetitive acts designed to neutralize or weaken that threat, which has caused injury not only to Sun, but also to software consumers.

## VI.    MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE BROWSER MARKET

### A.    WEB BROWSER MARKET

126.    The product market for web browsers consists of software applications that allow users to view, navigate between, interact with, operate, and execute virtually all web content located on separate servers.  A web browser also provides a platform for application development.  The geographic market is worldwide.

127.    Through its illegal conduct, Microsoft has achieved and maintained a monopoly in this market for its web browser products, Internet Explorer and MSN Explorer.  Based on usage studies, Microsoft's Internet Explorer has approximately 90% share of the browser market.

128.    Products that compete with Internet Explorer include Netscape Navigator browser, Opera Software's Opera browser, NeoPlanet browser, and Sun's HotJava browser and a variety of products based on the Mozilla.org technology.

129.    There currently are no effective substitutes for web browsers, and substantial barriers to entry exist in the web browser market.  In particular, Microsoft's practice of bundling Internet Explorer with its Windows PC operating systems creates a substantial barrier to entry, as does its current practice

of offering Internet Explorer without direct charge to the consumer.  In addition, a positive network effect exists in the web browser market.  Given the increasingly dominant market share of Internet Explorer, browser application, plug-in and content developers prefer to develop applications and content for Internet Explorer.  This in turn reduces consumer access to alternative applications and content, and, on information and belief, reduces innovation in the market.

### B.    MICROSOFT'S ANTICOMPETITIVE CONDUCT AND DAMAGE TO CONSUMERS AND COMPETITION IN THE WEB BROWSER MARKET

130.    As discussed above, and as found and affirmed in *United States v. Microsoft*, Microsoft engaged in a series of anticompetitive acts directed against Netscape's Navigator browser in order to maintain its PC operating system monopoly.  Microsoft's acts not only protected its existing monopoly, but also allowed Microsoft to secure a new monopoly over the web browser market as well.

131.    By effectively pushing Netscape out and seizing control of the browser market, Microsoft has secured a strategic chokepoint for access to or use of information and services on the Internet.  As a result, Microsoft now has the power to:  (a) render Microsoft-specific the APIs for accessing Internet services; and (b) control whether those APIs will be available on competing platforms.  Instead of a system built on open standards allowing heterogeneous computers around the world running on different operating systems to fully interoperate, Microsoft has both the incentive and the power to force the adoption of new interfaces and protocols that will favor its Windows platform and degrade the ability of competing platforms to access or use the full functionality of the Internet or content distributed over the Internet.

132.    As found and affirmed in *United States v. Microsoft*, Microsoft's anticompetitive actions aimed at hindering the distribution of Navigator had the effect and intent, among others, of foreclosing Sun's Java platform from available distribution channels, thereby protecting Microsoft's operating systems monopoly from this middleware threat.  These acts also had the effect and intent of foreclosing competing browsers, such as Sun's HotJava browser and Mozilla-based browsers, from the market. These acts had the further effect of reducing consumer choice with respect to browsers and

39.

complementary computer products which require browsers, thereby reducing Sun's sales of

complementary computer products.

## VII.  MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE WORKGROUP SERVER OPERATING SYSTEM MARKET

### A.    THE WORKGROUP SERVER OPERATING SYSTEM MARKET

**133.**    Workgroup servers are a particular class of servers that typically connect to and

interoperate with PCs in order to perform a variety of functions.  The principal functions that modern

businesses purchase workgroup servers to perform are:  security (*e.g.*, authentication and authorization

of users when they connect their PCs to the network); file services (*e.g.*, accessing or managing files or

disk storage space on the network); printing services (*e.g.*, sending print jobs to a printer managed by the

server); distributed applications support for workgroups or departments; client administration; and

communications (*e.g.*, hosting and processing email, enabling users to access the Internet, hosting a

workgroup's website).  The operating system software for workgroup servers is a central and critical

element in the provision of such functionality.  The workgroup server hardware and operating system

are typically bundled and sold together.

**134.**    The market for licensing workgroup server operating systems is worldwide, and there

currently are no effective substitutes to workgroup server operating systems.  Sun and Microsoft directly

compete in the workgroup server operating system market.  Microsoft's products in this market include

Windows NT Server 4.0, Windows 2000 Server, and Windows Server 2003 Standard Edition.  Sun's

products in this market include Sun's Solaris operating system for Sun's workgroup servers (*e.g.*, Sun

Fire™ servers) and Sun's distribution of the Linux operating system for use with Intel compatible

workgroup servers from Sun.

**135.**    The market for licensing operating systems for workgroup servers is distinct from the PC

operating system market.  Because a workgroup server operating system always works in a "client-

server" network that combines PCs and servers into a single network, while a PC operating system may

be used as a standalone product, these operating systems serve different needs.  Additionally, because a

workgroup server operating system must serve a network of interconnected client PCs, it must be more powerful and reliable than a PC operating system.  Commercially, PC operating systems and workgroup server operating systems are marketed and sold separately.  Workgroup server operating systems also are significantly more expensive than PC operating systems.  Accordingly, PC operating systems are not effective substitutes for workgroup server operating systems.

136.    The market for licensing operating systems for workgroup servers also is distinct from the market for licensing operating systems for midrange and high-end servers ("enterprise servers").  The computer hardware on which workgroup server operating systems run belongs to a different market than the hardware on which midrange and enterprise server operating systems run.  Workgroup servers generally do not perform "business critical" processes such as transaction processing or large-scale database management, which instead are performed by more powerful and expensive enterprise servers.  Workgroup servers typically have one or two microprocessors and modest memory (up to around four Gigabytes), and usually cost $5,000-25,000 and generally do not exceed $50,000.  By contrast, midrange servers typically have from four to 24 microprocessors, significantly more memory (up to around 24 Gigabytes), and usually cost from $100,000 to $1,000,000.  Enterprise servers typically have at least 24 microprocessors (32 and 64 microprocessors are not uncommon) and significantly more memory (up to several hundred Gigabytes), and can cost up to several million dollars each.  Workgroup server operating systems also are marketed and licensed differently from midrange and enterprise server operating systems.  License terms and use rights are typically dependent on the underlying hardware or the number of users, which typically corresponds to the use to which the server is to be put (*i.e.*, as a workgroup server or enterprise server).  Consequently, as licensed, the operating systems for midrange and enterprise servers are not substitutes for operating systems for workgroup servers, and there is a distinct demand for workgroup server operating systems that is not met by the demand for midrange and enterprise server operating systems.

137.    Microsoft's share of the workgroup server operating system market has grown rapidly.

In 1995, Microsoft's unit share for sales of servers under $25,000 was only 17%. By early 2003, its

share was 65%. Because the above data includes some sales for specialized servers that do not function

as workgroup servers, Microsoft's market share is most likely understated. Market surveys based on

typical workgroup server workloads and uses indicate that Microsoft's market share is even higher.

Moreover, not only has Microsoft's anticompetitive conduct with respect to this market continued,

Microsoft's share of the workgroup server operating system market continues to increase.

### B.   WORKGROUP SERVER THREAT TO MICROSOFT'S PC OPERATING SYSTEM MONOPOLY

**138.**    Up until the early to mid 1990s, Microsoft did not offer commercially significant

workgroup server operating system products. Instead, companies like Novell, IBM, and Sun were

leading providers of workgroup server operating systems.

**139.**    Microsoft, however, came to realize that with the rising importance of networked,

distributed computing both within enterprises and across the Internet, workgroup servers were rapidly

becoming a powerful and valuable platform for applications. If developers increasingly wrote

applications that ran in whole or in substantial part on workgroup servers instead of PCs and those

applications were not tied to APIs controlled by Microsoft, the application barrier to entry protecting

Microsoft's PC operating system monopoly would gradually erode and its monopoly power would

dissipate. Microsoft understood that if commercially valuable applications primarily ran on workgroup

servers instead of PCs, consumers would be free to switch away from Microsoft's monopoly PC

operating system to alternatives like non-Intel-compatible desktop computers (*e.g.,* Apple's Mac

computers), non-Intel compatible-workstations (*e.g.,* Sun's Sparc workstations), or "thin-client" network

computers (*e.g.,* Sun's Sun Ray™ Appliance).

**140.**    Just as Microsoft set out to attack alternative application platforms like the browser and

Java platforms, Microsoft set out to attack and control the workgroup server operating system market in

order to prevent competitors from using workgroup servers as a platform that could attract users away

from Microsoft's monopoly PC operating system product, Windows. In addition, Microsoft viewed the

adjacent workgroup server operating system market as a lucrative market in which to expand its monopoly power. By controlling this adjacent market, Microsoft would increase its ability to extract monopoly rents from consumers and secure a strategic position within enterprises from which it could further expand its PC operating system monopoly power.

### C.    MICROSOFT'S STRATEGY FOR MONOPOLIZING THE WORKGROUP SERVER OPERATING SYSTEM MARKET

**141.**    Microsoft implemented a three-prong strategy for driving the adoption of Microsoft products in the workgroup server market. First, Microsoft replicated the applications barrier that it enjoys on the PC by reproducing all of the Windows APIs on its workgroup server operating system as well. Not only did Microsoft create a common set of APIs for its PC and workgroup server operating systems to leverage its installed base of Windows applications, it used its logo and certification programs for its PC operating system to coerce developers to write applications that also would run on its workgroup server operating system.

**142.**    Second, Microsoft intentionally acted to lock out rivals like Sun from the workgroup server operating system market by refusing to disclose technical information necessary for interoperation and degrading the limited interoperability that previously existed in the marketplace between Microsoft's PC operating system and non-Microsoft workgroup server operating systems.

**143.**    Third, Microsoft bundled critical networking functions and features into its PC operating system products, but then designed those functions and features so that customers cannot fully use that functionality unless they also purchase Microsoft's workgroup server operating systems. As a result, consumers cannot substitute a non-Windows server operating system if they wish to use all of the Windows PC functionality that they purchased as part of their PC operating system. In short, Microsoft has designed its PC operating system monopoly products to require the use of Microsoft workgroup server operating systems in order to access and utilize the full functionality contained in the PC operating system.

**144.**    By intentionally denying non-Microsoft workgroup servers the same ability to

interoperate with the functions and features of the PC operating system that are necessary and central to interoperation with workgroup servers, while making those same functions and features fully accessible only to Microsoft workgroup servers, Microsoft achieves the following:  (1) it impairs or reduces the value of competitive workgroup server offerings by comparison with the functionality that only Microsoft workgroup server products can access; (2) it increases the costs of developing and, ultimately, licensing competitive workgroup server offerings by causing competitors to incur higher costs to make their products partly interoperate with the PC operating system; (3) it exploits the widespread use of and resulting need for its monopoly PC operating system by forcing consumers to purchase ancillary products as well; and (4) it increases the switching costs for consumers by increasing the products that must be replaced from the PC operating system alone to the PC operating system and every Microsoft device or product to which it is connected.  Not only can Microsoft force consumers of adjacent workgroup server products to adopt Microsoft's version by adding Windows PC operating system dependencies, Microsoft also can force consumers to increase the rate at which they consume such adjacent products, by adding new PC operating system dependencies to such adjacent products (forcing their consumption), or by breaking backward compatibility with existing products (forcing their replacement).  Consequently, Microsoft is able to extract a portion of the monopoly rent available from its PC operating system monopoly in the form of the forced consumption of adjacent workgroup server products.

### D.    MICROSOFT'S EFFORTS TO REPLICATE ITS APPLICATION BARRIER IN THE WORKGROUP SERVER OPERATING SYSTEM MARKET

**145.**    To secure power in the workgroup server operating system market, Microsoft has built into its monopoly PC operating system barriers to connection and interoperation.  Microsoft created one such barrier by replicating in the workgroup server operating system market the applications barrier to entry protecting its PC operating system monopoly.

**146.**    One act undertaken by Microsoft to achieve that goal was to create a common set of APIs for both its PC operating systems and workgroup server operating systems.  Earlier versions of

Microsoft's PC operating system (Windows 3.0 and 3.1) were designed for 16-bit microprocessors.[8] When Microsoft initially launched its first workgroup server operating system (Windows NT), it developed the APIs for 32-bit microprocessors. This set of APIs, known as the "Win32 APIs," were then included within subsequent versions of the PC operating system such as Windows 95, Windows 98, etc. With each successive release, Microsoft has migrated the code base for its PC operating system and workgroup operating system towards each other to standardize the APIs offered with each. By ensuring that its workgroup server operating system used the same proprietary APIs as its monopoly PC operating system, and by refusing to disclose technical information necessary for others to interoperate, Microsoft ensured that only its workgroup server operating system could run the thousands of applications already written for Windows.

147.    By creating a common set of APIs between the PC and the workgroup server operating systems, Microsoft also sought to exploit the nexus between PC and server in the increasingly important realm of distributed computing. As discussed previously, applications are increasingly written as distributed applications in which some components of an application might execute on a PC and other components might execute on a server. To ensure that these components work well together, distributed applications are customarily written as a unified whole using a single set of tools. Because substantial components of such distributed applications must be installed and run on the Windows operating system due to Microsoft's illegal maintenance of its monopoly position on the PC, these distributed client-server applications tend to be written to the Microsoft-specific Win32 APIs and related Microsoft-specific object model called Component Object Model (COM, COM+, DCOM). Thus, by monopolizing the PC node of the network, Microsoft can force consumers and developers to use Microsoft APIs and object models when developing distributed applications that will run on both the PC and workgroup server. Moreover, because Microsoft and Microsoft alone, controls the Win32 APIs and COM, no other

---

[8]  A "16-bit microprocessor" can process data and memory addresses represented by a 16-bit number. A "bit" is a binary digit that can hold only one of two values: "0" or "1." Microprocessors with higher bit numbers (32-bit, 64-bit, etc.) have increased capability for handling larger programs and executing them more quickly.

vendor could offer the Win32 APIs and COM on their workgroup server operating systems, absent
Microsoft's consent.

148.    Another act undertaken by Microsoft to replicate its applications barrier to entry was to
use the logo and certification requirements for its PC operating system products to coerce developers to
write applications that would also run on Windows NT – Microsoft's workgroup server operating
system.

E.    **MICROSOFT'S EFFORTS TO LOCK-OUT COMPETITION BY FORECLOSING
INTEROPERABILITY EFFORTS AND ENGAGING IN DISCRIMINATORY LICENSING
PRACTICES**

149.    Microsoft has strong incentives to create interoperability problems for its competitors,
and has a unique ability to do so by virtue of its dominant position in the PC operating system market.
Limited interoperability lowers the quality of the service that can be provided by competing workgroup
server operating systems.  Creating such interoperability problems allows Microsoft to exploit its
monopoly power in the PC operating system market in order to shift demand to its own workgroup
server operating system, thereby improperly increasing Microsoft's market power in the adjacent market
of workgroup server operating systems.

150.    Creating such interoperability problems also assists Microsoft's efforts to maintain its
monopoly in the PC operating system market.  In the increasingly important realm of distributed
computing (in which single applications are executed partially on the client and partially on the server),
the nexus between PC and server creates a "positive feedback effect" for the company with the dominant
PC operating system market share – here Microsoft with Windows.  By creating interoperability
problems between Windows and the workgroup server operating systems of its competitors, Microsoft
can not only gain market power for its workgroup server operating systems, but also leverage that
market power to further entrench its Windows monopoly.  This further entrenched Windows PC
monopoly creates an even larger market share for Microsoft's workgroup server operating systems,
which in turn even further entrenches the Windows PC monopoly.

**151.**   A key chokepoint that Microsoft controls and has used to achieve those goals is its ability to define and control the interfaces and protocols between the Windows client and the workgroup server operating system.

**152.**   The cost of such a strategy to Microsoft is low.  Refusing to disclose technical information necessary for workgroup server interoperation with the PC is essentially costless.  Similarly, degrading existing competitors' interoperability by making slight changes to the PC operating system and then not disclosing that information also can be achieved at a low cost.

**153.**   This anticompetitive strategy can succeed only because of Microsoft's dominance in the markets for client PC operating systems.  If Microsoft did not have an effective monopoly in the market for PC operating systems, sellers of PC operating systems would compete in both price and degree of interoperability with the whole market of workgroup server operating systems.  For example, if Microsoft refused to support interfaces and protocols supported by the majority of workgroup server operating systems, it would likely lose market share to PC operating systems that supported such interfaces.  Similarly, if it tried to enhance demand for its workgroup server operating systems by withholding functionality in its PC operating system to users of non-Microsoft workgroup server operating systems, it could lose market share for its PC operating system to competitors who offered a wider range of functionality without such limits.  Thus, the inability of users to substitute away from Microsoft's dominant PC operating system and office productivity applications makes it possible for Microsoft to successfully degrade the relative quality of competitors' products in the workgroup server operating system market.  This undermines the opportunity for greater product innovation and reduces consumer choice.

**154.**   Microsoft has intentionally created barriers to interoperation between PCs and non-Microsoft workgroup servers with a purpose of locking out competitors like Sun.  Microsoft has intentionally developed and adopted Microsoft-specific interfaces designed to exclude competitors from providing competing workgroup server operating systems that interoperate with Windows PCs to the

same extent as Microsoft's workgroup server operating system.  Microsoft also has intentionally refused to provide competing firms in the market for workgroup server operating systems with the information or licenses required to allow them to interoperate with Windows PC computers as effectively as Windows workgroup servers.

155.    Not only has Microsoft intentionally refused to make disclosures necessary for interoperability with its monopoly PC operating system products, it has intentionally taken steps to foreclose even the limited degree of interoperability it previously allowed in the past.

156.    Under a license from Microsoft granting it access to technical information concerning the then-current versions of Windows, AT&T developed a product called Advanced Server for UNIX ("AS/U"), which was a software layer that, when placed upon a UNIX server operating system, enabled some limited interoperation between Windows PCs and UNIX servers for particular network services such as file, print and the then-existing security system.  Sun licensed the source code for AS/U from AT&T in order to develop its own version of AS/U for its Solaris operating system.  Sun termed this product PC NetLink.

157.    While AS/U and PC Netlink allowed some interoperability between Windows PCs and Sun servers, there were major limitations to interoperation.  Examples of interoperation not supported by AS/U and PC Netlink included running Windows applications, running COM/DCOM applications, supporting MTS transactions or MSMQ queuing, or supporting certain advanced file services.

158.    But even that high a level of impairment in interoperability was not high enough to satisfy Microsoft.  To ensure that competitors like AT&T and Sun could not have access to more recent versions of its workgroup server operating system products, Microsoft refused to give AT&T continued access to technical information for newer versions of Windows in order to support its AS/U product.  As a result, neither AS/U nor PC Netlink could be updated for later versions of Windows NT 4.0 or for Windows 2000 Server.  Both products therefore are effectively obsolete, particularly since Microsoft's latest workgroup server product (Windows 2000 Server) contains additional features and functionality

with which AS/U and PC Netlink cannot interoperate.  Following a dispute between Microsoft and

AT&T regarding the terms of their agreement, Microsoft announced that it paid AT&T an undisclosed

amount to allow Microsoft to avoid its disclosure obligations.

159.    In addition, while refusing to license at any price the technology necessary for Sun's

servers to interoperate with Microsoft's PC operating system, Microsoft has agreed to license key

portions of that technology on a discriminatory basis to other UNIX vendors who compete with Sun.

160.    Microsoft has licensed its COM technology to UNIX vendors like Digital Equipment

Corp. (now Hewlett-Packard) and Silicon Graphics, Inc., but refuses to license Sun on the same terms.

Such discriminatory licensing practices are intentionally designed to reward companies that Microsoft

views as "friends" and punish those it views as "enemies."  Because Sun is a vigorous, direct competitor

of Microsoft, Microsoft seeks to disadvantage Sun in the marketplace through these discriminatory

licensing practices.

161.    Furthermore, Microsoft engaged in a series of deceptive and anticompetitive acts relating

to its Windows Interface Source Environment (WISE) program, which granted certain licensees access

to the source code for Windows NT in order to develop products that would allow Microsoft

applications to run on competing UNIX operating systems.  Microsoft's deceptive and anticompetitive

conduct with respect to participants in that program such as Bristol Technology, Inc. and Mainsoft

Corporation further demonstrates Microsoft's efforts to hinder or foreclose opportunities for competitors

from offering interoperability solutions with Microsoft's PC and workgroup server operating systems.

F.    **MICROSOFT ENSURES THAT ONLY ITS WORKGROUP SERVER OPERATING
SYSTEM CAN FULLY INTEROPERATE WITH CRITICAL FEATURES AND
FUNCTIONALITY IN ITS PC OPERATING SYSTEM**

162.    Microsoft has exploited its monopoly power in the PC operating system market to favor

its workgroup server operating system.  Use of a PC in a networked environment requires close

interoperation between the PC (the client) and the workgroup server for certain key functions.  Among

the most important core functions of any such networked environment are security (authentication and

49.

authorization), file and print services, directory services, network administration, and distributed application support. The business versions of its monopoly PC operating system that Microsoft sells for use in such networked environments (*e.g.*, Windows 2000 Professional and Windows XP Professional) contain software components for performing each of these key networking functions. Thus, when a consumer purchases a copy of these PC operating system products, a substantial portion of the purchase price can fairly be allocated to these components.

163.    Through use of Microsoft-specific interfaces and protocols that it refuses to disclose or license, Microsoft has designed these vital networking functions and features in such a way that only Microsoft's workgroup server operating system can fully interoperate with them. As a result, consumers must purchase Microsoft's workgroup server operating system if they wish to realize the full value of the functions and features of Microsoft's PC operating system that Microsoft's illegally maintained monopoly power effectively forces them to purchase.

164.    Alternatively, if consumers choose to purchase a non-Microsoft workgroup server operating system, then they must forego not only the use of substantial portions of the Windows PC operating system that they have already paid for, but they also must incur substantial, additional costs to deliver and install additional functionality on their PCs in order to interoperate with the non-Microsoft workgroup servers. By imposing these additional costs on consumers who choose competing workgroup server operating systems, Microsoft effectively diminishes the commercial appeal of these competing alternatives.

165.    The following list contains examples of: (a) functions and features contained in versions of Microsoft's monopoly PC operating systems like Windows 2000 Professional and Windows XP Professional that cannot be fully accessed, used, or re-created by competing non-Microsoft workgroup server operating systems; and (b) the corresponding undisclosed, Microsoft-specific technologies, interfaces, and protocols that block such interoperability and competition:

| Functions and Features | Undisclosed, Microsoft-Specific Technology |
|---|---|
| Security | • Active Directory<br>• Extensions to Kerberos Authentication Standards<br>• X.509 Extensions for Digital Certificates<br>• Security Support Provider Interface (SSPI)<br>• Passport |
| File/Print Services | • Extensions to Common Internet File Systems (CIFS)<br>• Microsoft's Distributed File System (DFS) |
| Directory Services | • Active Directory<br>• Extensions to Kerberos Authentication Standards |
| Distributed Application Support | • COM<br>• COM+<br>• DCOM<br>• ActiveX<br>• Win32 APIs<br>• Microsoft Remote Procedure Call (MSRPC)<br>• Microsoft Message Queuing (MSMQ)<br>• Microsoft Transaction Server (MTS) |
| Network Administration | • IntelliMirror<br>• Microsoft Management Console (MMC)<br>• Windows Management Instrumentation (WMI) |

**166.** Microsoft-specific extensions to the Kerberos Authentication Standards exemplify how Microsoft has used its PC operating system monopoly to engage in exclusionary conduct with substantial anticompetitive effect in the workgroup server operating system market.

**167.** Authentication is the method for identifying a user, device, or application connected to a network before access to the network is granted. For example, a user typically enters a password and user name before being allowed to sign-on to the network. Once a user is authenticated, he may be authorized for different types of access. Authorization is the process of enforcing policies to determine what types of activities, resources, or services a user is permitted to use.

**168.** Kerberos is a public standard for providing a highly secure means to authenticate the identity of users, devices, and applications connected to a computer network. It was originally developed at the Massachusetts Institute of Technology, and is an open standard published by the Internet Engineering Task Force. Kerberos has been widely adopted by competing operating systems, allowing them to interoperate securely.

**169.** Microsoft's PC operating systems – Windows 2000 Professional and Windows XP Professional – contain a Local Security Authority, which implements a modified version of Kerberos that incorporates undisclosed extensions to the public standard. Because Microsoft does not disclose its extensions to the Kerberos standard, a non-Microsoft server cannot create the required Microsoft-specific security "tickets," nor use all of the data passed in a Microsoft "ticket." As a result, if consumers wish to use the advanced security features implemented and sold in the Windows PC operating systems that they purchased, they must purchase and use a Microsoft workgroup server operating system to do so.

**170.** In addition to the "core" networking features identified above, Microsoft also has bundled additional code for its PC operating systems that only Microsoft workgroup server operating systems can support. For example, Microsoft bundles Windows Media Player with every copy of its PC operating system. Windows Media Player is a software program that stores, manages, and plays audio and video content from CD, DVDs, or "streaming content" downloaded from the web. Microsoft also bundles Windows Media Services – server software for "streaming" audio or video content – with every copy of its workgroup server operating system – Windows 2000 and Windows Server 2003. For streaming content, the Windows Media Player must receive a Microsoft-specific format called Advanced Streaming Format. Only Microsoft's Windows Media Services software can serve or "stream" this Microsoft-specific Advanced Streaming Format. As a result, if enterprises wish to stream audio or video to the Windows Media Players bundled with Windows PCs, then they must purchase and use Microsoft's workgroup server operating system in order to deliver content in the Microsoft-specific

Advanced Streaming Format. In addition, Windows Media Player incorporates a proprietary digital rights management ("DRM") system that precludes the use of anything other than a Windows server from streaming audio or video content to the Windows Media Player.

171.    In addition, Windows Rights Management Services is new code for Windows Server 2003 that will be used to protect confidential emails, documents, and web pages. In conjunction with updated client code that is being distributed as part of Microsoft's Windows Update service, Office 2003, and future versions of the Windows PC operating system, this code would allow, for example, the author of an email or document to restrict the recipient's ability to forward, print, or save such email or document. Since the protected emails, documents, and web pages require the Windows Rights Management Services for "decryption," competing operating system vendors like Sun will be unable to support such functionality absent Microsoft's disclosure or licensing of the technology. Thus, through the exercise of its unlawful control of the PC operating system, web browser, and office productivity suite markets, Microsoft is able to bundle and thereby distribute code as part of Windows and Office that prompts or forces consumers to create emails, documents, and web pages that can be utilized only on a PC running Windows and for which permission must be granted by a server running Windows.

### G.    OTHER TECHNICAL TIES AND BUNDLING PRACTICES THAT FORCE THE ADOPTION OF MICROSOFT SERVER APPLICATIONS THAT WILL ONLY RUN ON MICROSOFT'S WORKGROUP SERVER OPERATING SYSTEM

172.    Not only does Microsoft use anticompetitive acts to force the adoption of its workgroup server operating systems, it also engages in a series of such acts to force consumers to adopt server applications that will run only on Microsoft's workgroup server operating systems. Though indirect, the anticompetitive effect of this conduct is just as powerful, and can set in motion a series of technical ties that force consumers to purchase additional Microsoft products in order to access or utilize some of the most valuable or desirable features and functionality provided in Microsoft's monopoly products, such as Windows or Office.

173.    For example, Microsoft bundles Outlook, a personal information management and

communication program (e.g., email, calendar, contacts, etc.), within Office, its office productivity
application suite for Windows PCs.  To utilize the full features and functionality of Outlook, consumers
must purchase a Microsoft server application called Exchange Server.  Exchange will run only on
Microsoft's server operating systems such as Windows NT Server 4.0 or Windows 2000 Server.  But to
utilize all of the features and functionality of Exchange 2000 (the latest version of Exchange), including
some of its most valuable and desirable features, consumers must not only use a Microsoft workgroup
server operating system, but they must also specifically upgrade to the Windows 2000 Server operating
system and activate Active Directory functionality bundled with Windows 2000 Server.  This
substantially increases interoperability problems with any non-Microsoft server operating system
connected to the network.  Since Outlook and Exchange utilize Microsoft-specific interfaces, data
formats, schemas and protocols that Microsoft refuses to disclose or license to competitors like Sun, Sun
cannot provide competing server applications that will interoperate fully with some of the most valuable
and desirable features and functionality of Outlook.  By thus tying together Office, Exchange, Active
Directory, and its workgroup server operating systems (e.g., Windows 2000), Microsoft is able to
foreclose competition for an array of server applications that will run only on Microsoft's workgroup
server operating system, as well as competition for the workgroup server operating systems that run such
applications, office productivity application suites, collaboration server software and directory service
software.

### H.    MICROSOFT'S EXCLUSIONARY CONDUCT REGARDING CLIENT ACCESS LICENSES AND CERTIFICATION PROGRAMS FOR APPLICATIONS

**174.**    Beginning with Windows 2000, Microsoft has implemented a new licensing policy
regarding the client access licenses (CALs), which consumers must purchase in order to allow their PCs
to access services provided by a Microsoft server operating system or application.  Prior to Windows
2000, a consumer was required to purchase a Windows Server CAL only if the client used NT for:  (a)
file and print services, (b) Microsoft Message Queue Server, (c) Microsoft Transaction Server, or (d)
Remote Access Service.

**175.**    The Windows 2000 Server license, however, now requires a CAL for each client computer that either is used by a Windows 2000-authenticated user or uses Windows 2000 Server Services. An authenticated user is defined to include a user who runs any application that authenticates to Active Directory.  Thus, even though such a user may use a competing workgroup server operating system for sign-on, print and file services, etc., that customer will need to purchase a CAL for every user running a program authenticating to Active Directory.

**176.**    The anticompetitive effect of this change in licensing policy is made plain in the context of a firm that uses a non-Microsoft workgroup operating system, but also needs to run Microsoft Exchange – a key server-side messaging and groupware software for Windows, which is optimized to work well with Microsoft's dominant Office product.  Previously, users of Microsoft Exchange who did not use Windows NT's operating system were not required to purchase a Windows NT CAL.  But since Exchange 2000 now authenticates to Active Directory, users will be required to purchase Windows 2000 CALs in addition to the Windows 2000 Server and Exchange licenses.  Since the CALs constitute a substantial percentage of the total cost of ownership for Microsoft's products, firms will have strong economic incentives to adopt Microsoft Windows 2000 Server operating system over non-Microsoft alternatives.  By requiring server applications developed by Microsoft (*e.g.*, Exchange) to authenticate with Active Directory, Microsoft can advantage its workgroup operating system over competitors' systems.

**177.**    Microsoft also is using its certification policy to achieve this result.  In order to carry a "Certified for Windows 2000 Server" logo, a third-party application must authenticate to Active Directory.  As a result, all users running applications certified to Windows 2000 Server will have to purchase CALs for Windows 2000 Server, even though they may be running a competing workgroup server operating system as their primary domain controller.  Since the "Certified for Windows 2000" logo is of significant commercial importance, firms will have significant economic incentives to use the Windows 2000 Server operating system throughout their enterprise, excluding competing products.

## VIII.   MICROSOFT'S TYING OF ITS IIS WEB SERVER SOFTWARE TO ITS WORKGROUP SERVER OPERATING SYSTEM

### A.   WEB SERVER SOFTWARE MARKET

**178.**   The product market for web server software consists of a software application designed to serve web pages to clients over a network.  The web server software hosts pages, scripts, programs, and multimedia files and serves them to a client, typically a web browser.  Although primarily used on computers with a network connection, web server software also can be used on computers without networks for testing purposes or presentation interfaces.  The geographic market for web server software is worldwide.

**179.**   The web server software handles requests from web browsers located on the same computer as the web server, or on another computer connected to the web server through a network connection.  Web server software generally has the capability to understand and fill requests using a variety of standard protocols such as HTTP (an information request protocol) or HTML (an information tagging standard).  Web server software also may include the ability to provide secure, encrypted connections with web browsers in order to complete confidential information exchanges, such as online commercial transactions.

**180.**   Web server software typically is able to execute smaller programs that can provide data for normally static web pages through technologies such as Java servlets, Java Server Pages, Microsoft's Active Server Pages, or Visual Basic Scripts.

**181.**   Microsoft's products in the web server market include Internet Information Server ("IIS").  Sun offers competing products in the market, including iPlanet™/Sun ONE Web Server.  Other competing products in the market include the open-source Apache web server.  Microsoft's market share among web servers has consistently grown over the past several years.  According to recent published reports, Microsoft has now taken the lead in providing web servers for secure connection web sites.

**182.**   There currently are no effective substitutes to web server software, and barriers to entry exist.  In particular, Microsoft's bundling of the IIS web server software at no disclosed additional

charge with its workgroup server operating system creates a substantial barrier to entry in distribution, and significantly restrains competition on the merits in the web server software market.

B.    **MICROSOFT'S UNLAWFUL TYING OF IIS TO ITS WORKGROUP SERVER OPERATING SYSTEM**

183.    Microsoft has market power in the market for workgroup server operating systems, and Microsoft bundles its web server software – IIS – with every copy of its workgroup server operating system products.  Since Windows NT 4.0, consumers have been unable to purchase Microsoft's workgroup server operating system without IIS.  While a browser mediates communications between a PC and the Internet, the web server software mediates communications between a server and the Internet.  By controlling this critical interface, Microsoft can control how information is delivered over the Internet.

184.    Relying on the same tactic that it used to seize control of the browser market, Microsoft has bundled IIS with its workgroup server operating system in order to use its market power to expand into the adjacent market for web server software.  Since every consumer who purchases a Windows workgroup server operating system product like Windows 2000 Server will already have paid for web server software, Microsoft's bundling harms competition in the web server software market.

185.    Once Microsoft dominates the web server market, it will be able to force the adoption of protocols and interfaces that can be accessed using only client-side Microsoft-specific technology.  By controlling these critical web server interfaces and refusing to disclose and license the protocols necessary for full interoperability, Microsoft forecloses competition in the web server market.

186.    Microsoft's efforts to force the adoption of Microsoft-specific web server technologies like Windows Media Server and the Passport authentication system (discussed below) are examples of this type of anticompetitive conduct.

IX.    **MICROSOFT'S TYING OF ITS ACTIVE DIRECTORY SERVER SOFTWARE TO ITS WORKGROUP SERVER AND PC OPERATING SYSTEMS**

187.    Microsoft bundles its directory service software – Active Directory – with copies of its

PC and workgroup server operating system products.  Consumers of Microsoft's Windows 2000 Server, Windows 2000 Professional, and Windows XP Professional operating systems are not able to purchase Microsoft's PC or workgroup server operating systems without Active Directory.

188.    Relying on a tactic previously used by Microsoft to seize control of the browser market, Microsoft has bundled Active Directory with its PC and workgroup server operating systems in order to raise barriers to competition in the PC and workgroup server operating system markets.

189.    In addition, Microsoft has engineered its Windows 2000 and Windows XP operating systems to use proprietary protocols and interfaces that only Active Directory-enabled Microsoft workgroup servers can support and interoperate with.  Once Active Directory is deployed on a network, the network is effectively forced to use only PCs with Microsoft PC operating systems and only workgroup servers with Microsoft's workgroup server operating systems, because only Microsoft operating systems can support the undisclosed interfaces and protocols that Active Directory requires for network registration and interoperation.  Microsoft also encourages independent software vendors to develop applications that utilize the Active Directory software bundled with Microsoft's PC and workgroup server operating systems.  The existence of applications that require Active Directory serves to create another barrier to competition that effectively precludes consumers from switching to competing workgroup server operating systems or alternative directory service products like Sun's SunOne Directory Server.

190.    Once Microsoft ensures the dominance of Active Directory, it will further be able to force the adoption of protocols and interfaces that can only be accessed using client-side Microsoft-specific technology.  By controlling these critical directory service interfaces and refusing to disclose and license the protocols necessary for full interoperability, Microsoft forecloses competition and raises barriers to competition in the workgroup server and PC operating system markets in which Sun competes.  In addition, Sun's ability to compete with its SunOne Directory Server is also injured as a result of Microsoft's actions.

## X.   MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE OFFICE PRODUCTIVITY SUITE MARKET

### A.   OFFICE PRODUCTIVITY SUITE MARKET

**191.**     In the early to mid-1990s, many of the applications that are now included in office productivity suite products were sold individually, and each application was a separate relevant market. Thus, separate markets existed for word processing, spreadsheet, and presentation programs.  In the period that followed, from the mid-1990s to the present, the markets for office productivity applications changed.  During this later time period, the majority of individual office productivity applications such as word processing, spreadsheets, and presentations programs were sold together as part of an office productivity suite.

**192.**     The office productivity suite market consists of a grouping of office productivity application programs that perform common business tasks.  An office productivity suite traditionally contains a word processing application, a spreadsheet application, a presentation application, and a database application.  Additional applications for personal information management (*e.g.*, email, calendar, address book) also may be included.  The geographic market is worldwide.

**193.**     Microsoft has achieved and maintained a monopoly in this market for its office productivity suite product, Office.  Based on worldwide revenues for 1999, Microsoft's Office product has a 96% market share in the office productivity suite market.

**194.**     Other competing products in the office productivity applications suite market include IBM/Lotus's Smart Suite, Corel's WordPerfect Office, and Sun's StarOffice.

**195.**     Given the substantial expenditures necessary to develop a suite of office productivity applications, and the substantial network effects that constrain the adoption of new productivity applications, barriers to entry are substantial, including the necessity of having several integrated products to sell as a suite.

**196.**     Office is Microsoft's suite of office productivity applications.  Office comes in a variety of different configurations, with each configuration offering at least Microsoft's word processing

application (Microsoft Word) and Microsoft's spreadsheet application (Microsoft Excel).

**B.    MICROSOFT'S ANTICOMPETITIVE CONDUCT**

197.    Sun merged with Star Division, Inc. in 1999 and acquired all rights to any cause of action Star Division possessed.  Star Division developed a word processing program that it marketed in competition with Microsoft throughout the 1990s.  In the mid-1990s, Star Division developed, manufactured, and began selling the StarOffice office productivity suite.  StarOffice, now developed and sold by Sun, competes in the office productivity suite market.

198.    Microsoft has used its power in the PC operating system market, in combination with anticompetitive and exclusionary conduct, to unlawfully monopolize the office productivity suite market. The anticompetitive conduct used by Microsoft to monopolize the office productivity suite market includes deception of competitors, software developers, and consumers; exclusionary contracting and pricing practices; creation of technical barriers to interoperability; enhancement of the applications barrier to entry; and undermining consumer choice by inflating the switching costs associated with substituting a competing office productivity suite for Microsoft Office.  In turn, Microsoft uses its control of the office productivity suite market to protect its PC operating system monopoly.  Because office productivity suites are the primary way in which the majority of users interact with their PC, Microsoft Office is a strategically important weapon that Microsoft wields to maintain and expand its monopoly.  Office productivity suites constitute a critical basis for the applications barrier to entry protecting Microsoft's PC operating system monopoly.

199.    By controlling the office productivity suite market, Microsoft controls whether the applications contained in Microsoft Office are ported to competing platforms.  If a company other than Microsoft owned Office, it would be interested in porting its applications suite to as many platforms as possible, assuming it was economically rewarding to do so.  By contrast, if Microsoft ported Office or Word to competing operating systems like Solaris or Linux, it would remove a critical part of the applications barrier protecting its PC operating system monopoly from competition.  Thus, Microsoft

has predictably refused to port, and has illegally prevented others from porting Office to other platforms in order to illegally maintain its PC operating system monopoly. Microsoft also has used Office, in the case of Apple Computer's Macintosh operating system, to exact anticompetitive agreements in exchange for continued support on competing platforms.

200.    Microsoft's anticompetitive acts discouraged software developers from developing applications for non-Microsoft operating systems such as Solaris, increased the cost of porting applications to Sun's platforms, and hindered the porting of Windows applications to Sun's platforms. Because office productivity suites play a critical role in the commercial appeal of desktop computers and operating systems, Microsoft's anticompetitive conduct has injured Sun's ability to sell Solaris workstations as well as complementary products like servers, software applications, and services.  Sun's acquisition of StarOffice was in part an effort to mitigate the detrimental effects of Microsoft's monopolization of the office productivity suite market and to reduce the applications barrier to entry protecting its PC operating system monopoly.

201.    Because Microsoft has had unique access and knowledge of the Windows APIs necessary for the development of office productivity suite applications, by denying competitors the same degree of access to such information, Microsoft maintains and extends its monopoly power.  By providing Microsoft developers working on Office with earlier and better access to changes to the Windows APIs, Microsoft has foreclosed competition from other office productivity suites like Corel's WordPerfect Office, IBM/Lotus's SmartSuite, or Sun's StarOffice.

202.    By controlling Office, Microsoft also controls the file formats generated by these applications.  To maintain its monopoly position and decrease competition, Microsoft has adopted Microsoft-specific file formats, obstructing competitors' abilities to interoperate with such files. Consequently, competing office productivity suites, like Sun's StarOffice, are unable to read or duplicate these Microsoft-specific file formats in the same manner as Microsoft's Office.  As a consequence, for example, a word processing document saved in Microsoft's standard Word format

cannot be manipulated using StarOffice in the same manner that it can be manipulated using Microsoft's Word program.  By precluding full interoperability with competing office productivity applications, Microsoft obstructs competition.

203.     Microsoft also uses its control of Office to create technical ties and dependencies that force consumers to purchase additional Microsoft workgroup server products, including Microsoft Exchange Server, Microsoft Internet Information Server, Microsoft SharePoint Portal Server,  Microsoft SQL Server, and Microsoft Windows Server.  In order to effectively use all of Office's functionality in a networked client/server environment, a consumer must purchase these additional Microsoft products. As a result, if a firm later wishes to switch its office productivity suite or operating system, it will incur increased switching costs because it necessarily will have purchased and implemented not just Office, but a plethora of other Microsoft products as well.  This interlocking web of technical ties and dependencies is intentionally designed by Microsoft to raise the barriers to entry protecting its monopoly positions by significantly raising switching costs.  As distributed computing continues to become increasingly important, Microsoft's ability to exploit these ties and dependencies to drive additional server product sales only increases.

204.     For example, Microsoft bundles the Outlook e-mail client software with its monopoly Office suite.  Microsoft also creates technical dependencies and ties between its Outlook e-mail client and the other products included within Office (e.g., Microsoft Word, Excel, etc.).  Moreover, Microsoft has designed Office/Outlook to compel consumers to purchase its Exchange Server software by including features in Outlook that will work only with Exchange.  For example, to fully use the group calendaring features of Outlook, a consumer must also purchase Microsoft Exchange Server software. Because the group calendaring functionality relies on undisclosed, proprietary Microsoft protocols, competitors cannot offer servers that will fully interoperate with this functionality in Outlook.  In the context of an enterprise which has paid for and installed thousands of copies of Microsoft's monopoly Office suite, competitors are substantially foreclosed from competing in the collaborative server

software market if they are unable to offer a server product that can fully interoperate with Microsoft's monopoly office product (including the Outlook e-mail client).

205.    Furthermore, although Outlook can be used as an email client for other collaborative servers, Microsoft has intentionally removed some functionality when Outlook is used to access a collaborative server other than Exchange in order to compel consumers to purchase and use Exchange.

206.    To the extent that Microsoft has disclosed or licensed any of the proprietary technology relating to Exchange to any third parties, Sun alleges that such licensing has been done in an intentionally discriminatory manner designed to foreclose competition from competitors like Sun.

207.    Additionally, Microsoft has used its control over the licensing and pricing of Windows to advantage Office over competing products.  For example, as an OEM, IBM sold PCs with Microsoft's Windows.  But it also sold an office productivity suite, SmartSuite, as an alternative to Microsoft's Office.  Over the course of several years, Microsoft repeatedly tried to move IBM away from competing with Microsoft Office by leveraging the fact that IBM needed to license Windows from Microsoft.  Through inducements, threats, and retaliatory conduct, Microsoft punished IBM for offering and promoting an alternative to Office by charging IBM a higher price for licensing Windows, delaying granting IBM a license to Windows 95, and withholding technical and marketing support relating to Windows.

208.    Microsoft has engaged in exclusionary licensing practices that have had a substantial anticompetitive impact on the market and have led to higher prices and less choice for customers.  These practices have not only substantially foreclosed and lessened competition in the office productivity suite market, they also have substantially foreclosed and lessened competition and raised entry barriers in the adjacent PC operating system and workgroup server operating system markets.  Left unchecked, Microsoft's practices will continue to foreclose competition across these markets.

209.    On information and belief, Sun alleges that Microsoft also has discounted the effective price it charges OEMs for Windows depending on whether the OEMs also pre-load and ship Office, or a

home version, Microsoft Works. In fact, some OEMs have entered into agreements with Microsoft that effectively require the OEMs to ship Microsoft Office applications or Microsoft Works with every new PC loaded with Windows. On information and belief, Sun alleges that Microsoft also has entered into contracts or made representations that it will discount the effective price for Microsoft Office applications if OEMs agree not to install and ship competing office productivity suites with their PCs.

210.    Microsoft also has used product pricing and bundling of Office itself to disadvantage competing products and maintain and expand the scope of its office productivity suite. For example, according to Microsoft, the estimated retail price of Office XP Professional Edition is $579. If the component applications were separately purchased, the total estimated retail price would be $1565. If a consumer wanted only Microsoft's dominant word processing (Word) and spreadsheet program (Excel), the estimated retail price would be $678 – $99 more than purchasing the complete Office bundle. As a result, consumers have strong incentives to purchase the Office suite, even though they may want only some of the bundled programs. The anticompetitive effect of this conduct is that it reduces competition for particular office productivity applications that may be more attractive to consumers. For example, consumers may prefer personal information management/email programs that compete with Microsoft's Outlook. But after being required to pay for a bundle of applications that includes Outlook, consumers will be less likely to purchase a competing personal information management/email program, even though it may offer superior functionality and a better individual price.

## XI.    MICROSOFT'S ANTICOMPETITIVE CONDUCT RELATING TO THE MARKET FOR GENERAL PURPOSE, INTERNET-ENABLED DISTRIBUTED COMPUTING PLATFORMS

### A.    MARKET FOR GENERAL PURPOSE, INTERNET-ENABLED DISTRIBUTED COMPUTING PLATFORMS

211.    General purpose, Internet-enabled distributed computing platforms (also sometimes called "middleware runtimes") consist of computer software implementing the programming and runtime environments necessary for the creation and execution of many different kinds of Internet-enabled distributed applications. An Internet-enabled distributed application is a software application in

which different components of an application are executed on different devices and interact via the Internet in order to perform such complex distributed tasks as transactional processing, message queuing, secure data access, or rich graphical interfaces.  The runtime environment is the portion of the platform responsible for executing ("running") the distributed applications.  The programming environment is the portion of the platform responsible for creating the distributed applications.

212.    General purpose runtimes for Internet-enabled distributed applications create a software layer above the operating system, but below the application program, that provides a common programming abstraction set of APIs that developers can target.  These runtimes are designed to mask underlying hardware or software heterogeneity across different computing platforms by providing a common runtime environment.  The primary components of these runtimes consist of a "virtual machine" and scalable class libraries that can be ported to and supported on different operating systems or environments.

213.    Since Internet-enabled distributed applications can target use by a range of categories of hardware, the runtimes that execute these applications need to be easily scalable and portable to different classes of hardware.  Therefore, runtimes that do not have the ability to support Internet-enabled distributed applications across the range of relevant devices are not reasonable substitutes.  Similarly, runtimes that do not support the execution of graphical user interfaces, transactional processing, message queuing and secure data access are not reasonable substitutes for general purpose runtimes.

214.    By abstracting the general purpose runtime from the specifics of the underlying hardware and software, a middleware runtime environment is created that provides the capability to execute code in a secure "sandboxed" environment without the risk of executing malicious code that may unwittingly cause damage to the operations of the device or the native software.  The so-called "middleware abstraction" also allows for the general purpose runtime to verify the integrity and reliability of the code accessed by the user to ensure that the code will function in the manner anticipated.  Runtimes that lack the abstraction, and therefore, the convenient capability to provide the sandboxed security or the check

for integrity and reliability are not reasonable substitutes to a user of Internet-based distributed applications.

215.    Software developers designing Internet-based distributed applications choose among a subset of general purpose programming tools to develop these applications. The primary components of general purpose runtime-based programming environments consist of the programming language, compilers, the accompanying class libraries, and additional tools that facilitate the creation of application code. The relevant consumers for these products are programmers who develop Internet-based distributed applications. Microsoft's Visual Studio .Net and the implementations of the Java programming environment offered by Sun and others (*e.g.* Borland) are the main products available to developers in this market. The geographic market is worldwide.

216.    Programming environments that are not runtime-based, or target particular categories of hardware, are not reasonable substitutes because applications developed using such programming environments limit the ability to execute and interact with a range of devices over the Internet. Programming environments that do not allow for the execution of the Internet-based application on a PC are not reasonable substitutes either. Similarly, programming environments for a specific range of functions (*e.g.* for the execution of a media player application) are not reasonable substitutes for general purpose programming environments which can support a wide range of functionality and applications.

217.    The product market for general purpose, Internet-enabled distributed computing platforms consists of computer software implementing the programming and runtime environments necessary for the creation and execution of applications for computing on and between personal computers and servers. An Internet-enabled distributed application is a software application in which different components of an application may be executed on different personal or server computers and interact via the Internet in order to perform such complex distributed tasks as transactional processing, message queuing, secure data access, or rich graphical interfaces. An Internet-enabled distributed application also may execute on a personal computer or a server computer, provided it is written to a

platform capable of executing Internet-enabled distributed applications. Similarly, such an application may execute via a network between a personal computer and a server, provided it is written to a platform capable of executing Internet-enabled distributed applications. The runtime environment is the portion of the platform responsible for executing ("running") the distributed applications. The programming environment is the portion of the platform responsible for creating the distributed applications.

218.    The geographic market is worldwide. Microsoft's products in the market include Microsoft's .NET platform, including its Visual Studio .NET programming tool and .NET Framework runtime. Sun competes in the market by offering its J2SE and J2EE-based implementations of the Java platform, including its Sun ONE Studio, Java Development Kit, Java SDK, Sun ONE Application Server, Java Plug-in, and Java HotSpot Virtual Machine. There currently are no effective substitutes to general purpose, Internet-enabled distributed computing platforms. Substantial barriers to entry, specifically relating to distribution and deployment, exist.

219.    In the alternative, the product market for general purpose, Internet-enabled distributed computing platforms consists of computer software implementing the programming and runtime environments necessary for the creation and execution of applications on and between personal computers, servers, and small devices like PDA's, phones, and set-top boxes.

220.    The geographic market is worldwide. Microsoft's products in this market include Microsoft's .NET Framework and .NET Compact Framework platforms, including its Visual Studio .NET programming tool, .NET Framework runtime, and .NET Compact Framework runtime. Sun competes in the market by offering its implementations of the Java platform, including its Sun ONE Studio, Java Development Kit, Java SDK, Sun ONE Application Server, Java Plug-in, and Java HotSpot Virtual Machine. There currently are no effective substitutes to general purpose, Internet-enabled distributed computing platforms. Substantial barriers to entry, specifically relating to distribution and deployment, exist.

B.    MICROSOFT'S ANTICOMPETITIVE CONDUCT AND DAMAGE TO CONSUMERS AND
     COMPETITION IN THE GENERAL PURPOSE, INTERNET-ENABLED, DISTRIBUTED
     COMPUTING PLATFORM MARKET

221.    The following allegations in this section relate to both of the relevant markets alleged

above in the alternative.

222.    In the U.S. government's litigation against Microsoft, the District Court for the District of

Columbia found (and the Court of Appeals for the D.C. Circuit affirmed) that Microsoft viewed the Java

platform as a significant competitive threat to Microsoft's monopoly in Intel-compatible personal

computer operating systems, acted unlawfully to eliminate that threat to its monopoly power, and in so

doing retarded and perhaps altogether extinguished the competitive threat posed by the Java platform.

223.    What made the Java platform especially threatening to Microsoft was the fact that its

Internet-enabled, secure, distributed computing architecture was so advanced, and so appealing to

software developers and IT consumers, that Microsoft literally had nothing to compete.  That is why

Microsoft particularly feared that broad distribution of the Java platform would prompt even more

developers to create Java-based applications for the Java platform.  The more Java-based applications

that developers produced for desktop computers, the more consumers could replace or ignore

Microsoft's Windows operating system, thus eroding Microsoft's monopoly in the PC operating systems

market.

224.    Recognizing that it would take years to develop a comparable platform that could

compete with the secure, Internet-enabled middleware features of Sun's Java platform, Microsoft sought

first to gain control over Sun's Java platform, and then to reduce its appeal to and/or delay its adoption

and use by independent software developers and end users.  First, Microsoft licensed from Sun the right

to build compatible versions of the Java platform and incorporate them into its Windows operating

systems and Internet Explorer browser.  Second, Microsoft breached its license agreement with Sun by

distributing incompatible, Microsoft-dependent Java platforms and tools that increased the cost to

developers and consumers of using the Java platform and undermined the commercial appeal of the Java

platform.  Third, Microsoft entered into exclusive deals with developers and OEMs to require the

distribution and use of Microsoft's incompatible, Microsoft-dependent versions of the Java platform to the exclusion of Sun's standard Java platform and tools.  Fourth, Microsoft undermined the distribution of Netscape's Navigator browser, the primary non-Microsoft distribution channel for desktop Java runtimes.  By destroying the Navigator distribution channel for Java platforms, Microsoft became the dominant distribution channel for Java platforms to desktop computers, thus making its incompatible, Microsoft-dependent Java implementation the *de facto* standard on desktop computers.  Fifth, Microsoft deceived software developers about the fact that applications developed for its incompatible Java runtime using its incompatible Java-based tools would be dependant on and tied to Microsoft's Windows platform.

225.    These acts, once revealed, had the effect of greatly reducing, if not eliminating, the incentive of software developers to create applications for the Java platform that required the presence of a Java runtime environment on desktop computers.[9]  Not only could they no longer create a single application that would execute properly on every desktop Java platform, but the size of the potential market for such applications was dramatically reduced by Microsoft's anticompetitive acts.  Microsoft's acts also had the effect of reducing the supply of Java-based applications by requiring developers to create incompatible, Microsoft-dependent Java-based applications in return for early "first-wave" access to Windows technical information.  And that, in turn, greatly reduced the adoption and deployment of the Java platform on desktop computers by end users, consumers, and websites.

226.    As the District Court for the District of Columbia found, "Microsoft has retarded, and perhaps altogether extinguished, the process by which [Netscape and the Java technology] could have facilitated the introduction of competition into an important market."  Microsoft has used the resulting delay and reduced demand for adoption and deployment of the Java platform to good effect.  After five (5) years of development, it has now released the first versions of a middleware platform that largely copies and mimics many of the pioneering advances of the Java platform.  Like the Java platform,

---

[9]  Microsoft's behavior also forced end-users who might wish to switch from Microsoft's Java runtime to any other Java runtime to incur unnecessary increased costs as well.

Microsoft's imitation, called the .NET Framework, is a general purpose, Internet-enabled platform designed for secure, distributed application programming.  Unlike the Java platform, however, it is designed for use with Windows only, and is not available for porting to any non-Microsoft operating system.  In other words, it is designed to maintain and expand the applications barrier to competition, not erode it.

227.    The .NET Framework is Microsoft's platform for building, deploying, and running secure, Internet-enabled distributed applications.  Like the Java platform, the .NET Framework exists as a layer on top of the Windows operating system, and essentially replaces many of the application programming interfaces of Windows used by developers.  Like the Java platform, .NET programs are built using new, strongly typed programming languages that have been specifically created for secure, productive development of Internet-enabled distributed applications.  Like the Java platform, the .NET Framework provides libraries of prewritten code that implement APIs that are built on top of and essentially replace the current Windows APIs.  Like the Java platform, .NET applications are compiled to a processor-independent intermediate language, and then translated into native code by an intermediate runtime.  Like the Java platform, .NET intermediate runtime, called the Common Language Runtime ("CLR"), is designed to inspect, load and execute intermediate language programs in a tightly controlled "sandbox," thus reducing possible threats to the host system by malicious code (*e.g.*, viruses) or inadvertent actions from trusted code.  Like the Java platform, the class-based, intermediate runtime architecture of the .NET Framework is designed to be scaled across computer devices ranging in size and power.

228.    More than six years after Sun's introduction of the Java platform, Microsoft touts its belated introduction of the .NET Framework as its most important initiative, one that will fundamentally transform its own business and the Internet in general.  By infusing .NET with Microsoft-specific interfaces, schemas and protocols that are shared by Microsoft's workgroup server operating systems, web servers, directory service software, mail servers, database servers, and productivity application

suites, Microsoft is attempting to initiate an application barrier to competition in the market for general purpose, Internet-enabled, distributed computing platforms.

229.    Microsoft's adoption of the general architecture and design of the Java platform for its .NET Framework validates the superiority and competitive appeal of the Java platform for development and execution of secure, Internet-enabled distributed applications.  While imitation can sometimes be the greatest form of flattery, Microsoft's use of its illegally obtained and maintained monopoly distribution channels to initiate a positive feedback effect for the .NET Framework, thereby entrenching a dominant, monopoly position for its Microsoft-only platform, is not.

230.    Microsoft is using the .NET Framework to strengthen its illegally maintained monopoly in the PC operating system market and to gain new monopolies in the markets for workgroup server operating systems and general purpose, Internet-enabled distributed computing platforms.  Microsoft is exploiting its illegally maintained PC operating system monopoly to rapidly grow the installed base of desktop computers that support its .NET Framework by distributing the .NET Framework as an optional component with its latest service pack for Windows XP, and by its announced plan to bundle the .NET Framework with its next Windows operating system release codenamed "Longhorn."  Microsoft also distributes the .NET Framework in its Tablet PC, Media Center PC, and Visual Studio .NET developer tool kit, and bundles the .NET Framework with Windows 2003 Server.  In addition, Microsoft is contracting with independent software developers, systems integrators, enterprise customers, and even universities to require their use and adoption of its .NET Framework.  Microsoft is also acting to increase distribution and adoption of the .NET Framework by incorporating dependencies between the .NET Framework and its MSN web properties, IE browser, Exchange server, and future versions of Office.  Through each of these means, Microsoft is attempting to make its .NET Framework the *de facto* choice for Internet-enabled, distributed computing.

231.    By initiating massive, rapid distribution of the .NET Framework for PCs and servers, Microsoft hopes to initiate a "positive feedback effect" that will increase application barriers to

competition and entrench the .NET platform as the *de facto* monopoly platform for general purpose Internet-enabled, distributed application programming. Once initiated, this "positive feedback effect" will provide third party developers irresistible economic incentives to develop applications for the Microsoft-dependent .NET platform. The resultant base of applications for the .NET platform will in turn create unparalleled incentives for consumers to adopt and use the .NET platform. And that, in turn, will further enhance the incentives of developers to develop applications for the .NET platform, thus entrenching its market position as the dominant, monopoly platform.

232.    In addition, Microsoft is using the development tools for the .NET Framework to continue to attempt to deprecate and fragment the Java programming environment. On October 10, 2001, Microsoft released a beta version of a product called Visual J#.NET. Visual J#.NET is a development tool that will connect into Microsoft's integrated software development tool, Visual Studio.NET. Visual J#.NET contains a Microsoft-specific implementation of a polluted version of the Java language that will produce programs that can run on Microsoft's .NET Framework. Although Visual J#.NET purports to provide support for writing programs in the Java language, Microsoft has changed the syntax of the Java language in a number of ways, ensuring that that the source code written using Visual J#.NET will not be compatible with source code written following the public specifications for the Java language. Moreover, Visual J#.NET contains a compiler that, instead of compiling code into standard Java bytecodes, compiles the code into Microsoft Intermediate Language code, which will run on only the Microsoft-specific .NET Framework. Thus, Visual J#.NET distorts the Java language from a language that can be used to write vendor-independent code that will run on a wide variety of platforms to Microsoft-dependent code that will run on only the Microsoft platform.

233.    In addition, on information and belief, Sun alleges that Microsoft has made false and deceptive statements regarding the ability of its Visual J#.NET product to pass the Java compatibility test suites. To the extent that Microsoft has used Sun's Java Compatibility Kit to test Visual J#.NET as it has represented, such use exceeds the scope of any license granted to Microsoft under the Settlement

Agreement with Sun.

234.    On information and belief, Sun alleges that Microsoft employees who had access to and knowledge of Sun's copyrighted source code for the Java Development Kit, were involved in the design and development of Microsoft's .NET Framework.

## XII.    MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO PASSPORT

235.    In addition to using the .NET Framework to establish a new Microsoft-specific platform for the Internet, Microsoft is using its Passport service in an attempt to control network authentication over the Internet.  Passport is Microsoft's service for providing single sign-on authentication across the Internet, and is a foundation service for Microsoft's .NET web services.  By entering a single sign-in name and password, users can be authenticated for access to Passport-enabled sites.

236.    When a registered Passport user attempts to enter a Passport-enabled site, they click a sign-on icon on that Passport Partner Website, which silently redirects them to a central Passport Login Server operated by Microsoft.  Once the user enters a sign-in name and password, the Passport Login Server authenticates the user, writes Passport "cookies" to the user's browser, and provides an encrypted authentication "ticket" and profile information which is passed back to the participating Passport Partner Website.  By running an application program called the Passport Manager, the Passport Partner Website can decrypt the authentication ticket, manage authorization and profile access, and silently re-verify the authentication cookies as the user moves from page to page on the Passport Partner Website.

237.    Microsoft is using its monopoly power to drive the use and adoption of its Passport service.  For example, Microsoft repeatedly prompts users to register for Passport when they install Windows XP.  Passport registration also is required or prompted for the following Microsoft products and services:

> (a)  Windows XP updates
>
> (b)  MSN Explorer
>
> (c)  Microsoft Office XP Outlook

(d) MSN Messenger

(e) Hotmail accounts

(f) Passport enabled e-commerce sites

(g) Microsoft web sites

(h) Front Page/Visual Studio products

(i) Participation in Microsoft's Open Licensing Program

(j) Participation in beta software programs

According to Microsoft, over 130 million Passport accounts have been opened. By tying the Passport service to the latest version of its monopoly PC operating system – Windows XP – and leveraging its control over key distribution channels for authentication services, the number of Passport accounts is likely to rapidly increase.

238.    By forcing adoption of a Microsoft-specific authentication system, Microsoft will compel consumers to purchase Microsoft server operating systems and applications. Only a Microsoft Windows Server 2000 product running Active Directory can act as a Passport Login Server that authenticates users through a single sign-in, since Microsoft has not disclosed or licensed the technology necessary for a competitor to provide that functionality. Microsoft does claim that servers running competing operating systems like UNIX can act as a Passport Partner Web Server, re-directing authentication to a Microsoft Passport Login Server. But even with respect to this limited role, Microsoft has favored its Windows platform by ensuring that the Passport Manager software necessary to perform that function on a UNIX platform cannot provide full support for Passport-enabled applications and is more difficult to implement and operate.

239.    Microsoft also announced in September 2001 that future versions of Passport would incorporate and support the Kerberos authentication protocols. But since Microsoft already has implemented Microsoft-specific extensions to Kerberos in other Microsoft products, it is likely to implement those same Microsoft-specific Kerberos extensions in its Passport service, ensuring that

competitors cannot provide products that fully interoperate with Passport.

## XIII.   MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO DEVELOPER TOOLS

**240.**     Microsoft is the dominant provider of application developer tools for the Windows platform.  Microsoft's integrated development environment, Visual Studio, has a dominant share in the market for developer tools for the Windows platform.

**241.**     Microsoft has designed Visual Studio to force or favor the development of applications that make use of Microsoft-specific interfaces and protocols over the use of existing open, vendor-independent interfaces and protocols.  Microsoft also has designed Visual Studio to increase the switching costs that would be incurred to port an application written for the Windows platform using Visual Studio to a competing platform.

**242.**     Microsoft has also bundled Visual Studio with the .NET Framework in its Visual Studio .NET development product.  Microsoft has designed Visual Studio .NET to force or favor the development of web services applications that make use of Microsoft-specific interfaces and protocols shared by Microsoft servers facilitating dynamic web services.

**243.**     On information and belief, Sun believes Microsoft has priced Visual Studio in order to discourage competitors from developing and selling their own application developer tools for the Windows platform and competing platforms.

**244.**     On information and belief, Microsoft has engaged in a series of anticompetitive steps designed to injure competing tools vendors such as Sun, Borland Software Corporation, and Symantec Corporation, among others.

**245.**     Microsoft's anticompetitive acts relating to developer tools had the effect and intent, among others, of increasing applications barriers to entry in the PC operating systems, workgroup server operating systems, and middleware runtimes markets.

## XIV.   MICROSOFT'S ANTICOMPETITIVE ACTS RELATING TO LICENSING

**246.**     Microsoft has engaged in a series of anticompetitive acts in connection with its software

licensing practices toward PC Original Equipment Manufacturers (OEMs), Independent Software Vendors (ISVs), customers, and competitors.  By imposing restrictive licensing conditions, selectively licensing critical technologies, refusing to license other critical technologies altogether, and imposing volume licensing programs that drive the purchase of additional Microsoft software and impede the adoption of non-Microsoft platforms, Microsoft has raised and/or maintained barriers to competition in the product markets in which it competes, including the markets for PC and workgroup server operating systems, browsers, office productivity suites, and general-purpose, Internet-enabled, distributed computing platforms.

247.    OEMs are highly dependent upon their licenses with Microsoft.  Microsoft has used this dependent relationship to create myriad barriers to competition through licensing practices, including, for example, imposing restrictions on the boot sequence for personal computers, offering favorable pricing in return for promotion of Windows server products, offering early access to Windows source code in return for an OEM's agreement not to load on PCs software that Microsoft felt threatened its interests, and requiring OEMs to agree not to assert intellectual property rights against Microsoft.  These practices have substantially lessened and foreclosed competition in the markets in which Microsoft competes.

248.    Given its monopoly power over critical software markets, Microsoft enjoys substantial power over Windows ISVs, and has used its licensing practices toward ISVs to create barriers to competition.  For example, in a series of agreements with ISVs known as "First Wave" agreements, Microsoft conditioned the access of certain ISVs to technical information, including early beta versions of  Windows PC and server operating system products, as well as their right to use Microsoft certification logos, on the agreement by those ISVs to use Microsoft's implementation of a Java Virtual Machine as the default Java platform. These and other licensing practices toward ISVs have had the purpose and effect of foreclosing competition in the PC and server operating system, browser, office productivity suite, and general-purpose, Internet-enabled, distributed computing platform markets.

249.    Microsoft has engaged in exclusionary licensing practices toward its customers that have had a substantial anticompetitive impact on the market and have led to higher prices and less choice for customers.  As implemented, Microsoft's Volume Licensing Programs, including its Software Assurance Plan and Enterprise Agreements, constitute unlawful exclusive dealing arrangements.  A substantial portion of the business consumers in the PC operating system, workgroup server operating system, and office productivity suite markets have entered into agreements under Microsoft's Volume Licensing Programs.  Microsoft uses its monopoly power, bundled discounts and discriminatory rebates, in combination with the anticompetitive and exclusionary conduct detailed in this complaint, to pressure customers to enter into these exclusive arrangements.  Agreements under Microsoft's Volume Licensing Programs, Software Assurance Plan, and Enterprise Agreements have the effect of precluding consumers from using competing products for their duration, which with limited exceptions is not less than three years.  Such agreements, are directly between Microsoft and business consumers, and they disproportionately preclude competition for enterprise customers, whose business is critically important to successful market entry or sustainable competition in the PC operating system, workgroup server operating system, and office productivity suite markets.  These exclusive dealing arrangements have substantially lessened and foreclosed competition in the PC operating system, workgroup server operating system, and office productivity suite markets.

250.    Microsoft has engaged in a series of exclusionary licensing practices toward its competitors that have the purpose and effect of undermining competition in each of the markets in which it competes.  These acts include refusing to license key technologies required for interoperability between Microsoft products and competing products, selectively licensing certain technology sets and not others, selectively licensing key technologies to some entities but not others, and imposing prohibitively restrictive licensing terms upon competitors.

251.    On information and belief, Sun alleges that when Microsoft does agree in principle to license technology to competitors, it does so on anticompetitive terms, such as requiring that competitors

agree to intellectual property grant-backs that shield it from intellectual property litigation.

252.   Microsoft continues to engage in exclusionary licensing practices toward its competitors, even under the auspices of its settlement agreement with the federal government.  The Communications Protocol Licensing Program (MCPP) instituted as part of that settlement provides only incomplete and poorly documented disclosure of communications protocols that it discloses, and omits other necessary protocols altogether.  The purpose and effect of the program is to provide the appearance of disclosure without providing disclosure sufficient to allow a competitor to develop fully interoperable products, thereby maintaining steep barriers to competition with Microsoft products.

## XV.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Illegal Maintenance of Intel-Compatible PC Operating System Monopoly in Violation of Section 2 of the Sherman Act

253.   Sun incorporates the allegations in paragraphs 1 through 252 above.

254.   Microsoft possesses monopoly power in the market for licensing Intel-compatible PC operating systems.  Significant entry barriers characterize that market.

255.   Microsoft has willfully maintained and extended that power by anticompetitive and unreasonably exclusionary conduct, including exclusionary licensing practices, reducing interoperability with competing operating systems and alternative computing platforms, tying, and refusals to deal, among other acts, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Unless restrained by the Court, Microsoft will continue to unlawfully maintain its monopoly power causing irreparable and continuing harm to Sun, for which Sun has no adequate legal remedy.

256.   Microsoft's anticompetitive acts have harmed consumers and competition.

257.   Microsoft has acted with the specific intent to maintain its monopoly power, and its illegal conduct has enabled it do so.

258.   Microsoft's conduct occurred in and affected global commerce, including United States interstate and foreign commerce.

**259.** As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 2 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, diminished licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial. Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

**SECOND CLAIM FOR RELIEF**

**Illegal Monopolization of Web Browser Market
in Violation of Section 2 of the Sherman Act**

**260.** Sun incorporates the allegations in paragraphs 1 through 259 above.

**261.** Microsoft possesses monopoly power in the market for web browsers. Significant entry barriers characterize that market.

**262.** Through the anticompetitive conduct described above, Microsoft has willfully obtained and maintained that power by anticompetitive and unreasonably exclusionary conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Unless restrained by the Court, Microsoft will continue to unlawfully maintain its monopoly power causing irreparable and continuing harm to Sun, for which Sun has no adequate legal remedy.

**263.** Microsoft's anticompetitive acts have harmed consumers and competition.

**264.** Microsoft has acted with the specific intent to obtain and maintain its monopoly power, and its illegal conduct has enabled it do so.

**265.** Microsoft's conduct occurred in and affected global commerce, including United States interstate and foreign commerce.

**266.** As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 2 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation,

diminished licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial.  Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.  Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### Unlawful Tying of Internet Explorer to Windows PC Operating System in Violation of Section 1 of the Sherman Act

**267.**    Sun incorporates the allegations in paragraphs 1 through 266 above.

**268.**    The Microsoft Windows PC operating system and Microsoft Internet Explorer web browser were and/or are separate and distinct products.  They were and/or are sold in separate markets; their functions were and/or are different; and there was and/or is separate demand for them.

**269.**    Microsoft has tied and plans to continue to tie its Internet Explorer web browser to its PC operating system.

**270.**    Microsoft has sufficient market power in the Intel-compatible PC operating system market to restrain competition in the web browser market as a result of its tying arrangement.

**271.**    The tie affects a not insubstantial amount of global commerce, including United States interstate and foreign commerce, in web browsers.

**272.**    The purpose and effect of this tying is to prevent customers from choosing among web browsers on their merits and to restrain competition in the web browser market.  There are no benefits from this tying that outweigh the harm to competition in the web browser market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**273.**    Microsoft's anticompetitive acts have harmed consumers and competition.

**274.**    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 1 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, lost

licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial. Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

FOURTH CLAIM FOR RELIEF

**Attempted Monopolization of the Workgroup Server Operating System
Market in Violation of Section 2 of the Sherman Act**

**275.**    Sun incorporates the allegations in paragraphs 1 through 274 above.

**276.**    Microsoft has willfully engaged, and is engaging, in a course of conduct, including exclusionary licensing practices, reducing interoperability between Microsoft's operating systems and rival workgroup server operating systems, tying, and refusals to deal, among other acts, in order to obtain a monopoly in the workgroup server operating system market, and there is a dangerous probability that, unless restrained, it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, if it has not already done so.

**277.**    Microsoft's anticompetitive acts have harmed consumers and competition.

**278.**    Microsoft has acted with a specific intent to monopolize and destroy effective competition in the workgroup server operating system market.

**279.**    Microsoft's conduct occurred in and affected global commerce, including United States interstate and foreign commerce.

**280.**    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 2 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, lost licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial. Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Sun will

suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

FIFTH CLAIM FOR RELIEF

**Unlawful Tying of Windows Workgroup Server Operating System to Windows PC Operating System In Violation of Section 1 of the Sherman Act**

**281.**    Sun incorporates the allegations in paragraphs 1 through 280 above.

**282.**    Microsoft's Windows PC operating system products (e.g., Windows 2000 Professional and Windows XP Professional) and Windows workgroup server operating systems products (e.g., Windows 2000 Server) are separate and distinct products.  They are sold in separate markets; their functions are different; and there is separate demand for them.

**283.**    Microsoft has tied and plans to continue to tie its Windows workgroup server operating system products to its Windows PC operating system.

**284.**    Microsoft has sufficient market power in the Intel-compatible PC operating system market to restrain competition in the workgroup server operating system market as a result of its tying arrangement.

**285.**    The tie affects a not insubstantial amount of global commerce, including United States interstate and foreign commerce, in workgroup server operating systems.

**286.**    The purpose and effect of this tying is to prevent customers from choosing among workgroup sever operating systems on their merits and to restrain competition in the workgroup server operating system market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  There are no benefits from this tying that outweigh the harm to competition in the workgroup server operating system market.

**287.**    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 1 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, lost licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial.  Sun's injury is of the type the antitrust laws are intended to

82.

prohibit and thus constitutes antitrust injury.  Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

## SIXTH CLAIM FOR RELIEF

### Unlawful Tying of IIS Web Server Software to Windows Workgroup Server Operating System In Violation of Section 1 of the Sherman Act

**288.**    Sun incorporates the allegations in paragraphs 1 through 287 above.

**289.**    Microsoft's workgroup server operating system products (e.g., Windows NT 4.0 Server, Windows 2000 Server) and IIS web server are separate and distinct products.  They are sold in separate markets; their functions are different; and there is separate demand for them.

**290.**    Microsoft has tied and plans to continue to tie IIS web server to its workgroup server operating system products.

**291.**    Microsoft has sufficient market power in the workgroup server operating system market to restrain competition in the web server market as a result of its tying arrangement.

**292.**    The tie affects a not insubstantial amount of global commerce, including United States interstate and foreign commerce, in web server software.

**293.**    The purpose and effect of this tying is to prevent customers from choosing among web servers on their merits and to restrain competition in the web server market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  There are no benefits from this tying that outweigh the harm to competition in the web server market.

**294.**    Microsoft's anticompetitive acts have harmed consumers and competition.

**295.**    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 1 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, lost licensing fees, computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial.  Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.  Unless the activities complained of are enjoined, Sun will

suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

### Attempted Monopolization of the Market For General Purpose, Internet-Enabled, Distributed Computing Platforms in Violation of Section 2 of the Sherman Act

296.    Sun incorporates the allegations in paragraphs 1 through 295 above.

297.    Microsoft has willfully engaged, and is engaging, in a course of conduct, including exclusionary licensing practices, reducing interoperability, tying, and refusals to deal, among other acts, in order to obtain a monopoly in the general purpose, Internet-enabled, distributed computing platform market, and there is a dangerous probability that, unless restrained, it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

298.    Microsoft's anticompetitive acts have harmed consumers and competition.

299.    Microsoft has acted with a specific intent to monopolize and destroy effective competition in the general purpose, Internet-enabled, distributed computing platform market.

300.    Microsoft's conduct occurred in and affected global commerce, including United States interstate and foreign commerce.

301.    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 2 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, lost licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial.  Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.  Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF

### Unlawful Tying of .NET Framework to Windows PC and Workgroup Server Operating System Products in Violation of Section 1 of the Sherman Act

302.    Sun incorporates the allegations in paragraphs 1 through 301 above.

303.    Microsoft's .NET Framework and Windows PC operating systems and Windows

workgroup server operating systems are separate and distinct products. They are sold in separate markets; their functions are different; and there is separate demand for them.

304.    Microsoft has announced it intends to tie the .NET Framework to its Windows PC operating systems and Windows workgroup server operating systems.

305.    Microsoft has sufficient market power in both the Intel-compatible PC operating systems market and the workgroup server operating system market to restrain competition in the general purpose, Internet-enabled distributed computing platform market as a result of its tying arrangement.

306.    The tie affects a not insubstantial amount of global commerce, including United States interstate and foreign commerce, in general purpose, Internet-enabled distributed computing platform software.

307.    The purpose and effect of this tying is to prevent customers from choosing among general purpose, Internet-enabled distributed computing platforms on their merits and to restrain competition in that market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. There are no benefits from this tying that outweigh the harm to competition in that market.

308.    Microsoft's anticompetitive acts have harmed consumers and competition.

309.    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 1 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, lost licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial. Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury. Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

### NINTH CLAIM FOR RELIEF
#### Unlawful Exclusive Dealing and Other Exclusionary Agreements in Violation of Section 1 of the Sherman Act

310.    Sun incorporates the allegations in paragraphs 1 through 309 above.

**311.**    Microsoft has engaged in licensing practices toward OEMs, ISVs, customers, and competitors that constitute unlawful exclusive dealing arrangements that have substantially lessened and foreclosed competition.

**312.**    Microsoft's agreements with ISVs, Apple Computer, and Intel not to develop for, distribute, or use a non-Microsoft compatible implementation of the Java platform unreasonably restrained competition.  Microsoft's agreements with OEMs and ISPs restricting the distribution of non-Microsoft products like Netscape Navigator that were important alternative distribution channels for distribution of compatible implementations of the Java runtime also unreasonably restrained and substantially lessened competition in the relevant markets.  These agreements unreasonably restrained trade and restricted the access of Sun to significant channels of distribution, thereby restraining nascent competition in the PC operating system and workgroup server operating system markets.

**313.**    Microsoft's agreements with OEMs, ISVs, and enterprise customers relating to the distribution and use of Microsoft's .NET Framework also unreasonably restrain trade and restrict Sun's access to significant channels of distribution.

**314.**    Microsoft's Volume Licensing Programs, including its Software Assurance Plan and Enterprise Agreements, constitute unlawful exclusive dealing arrangements that have substantially lessened and foreclosed competition.

**315.**    The purpose and effect of these agreements was to restrain trade and competition in the PC operating system, workgroup server operating system, office productivity suite, browser, and general purpose, Internet-enabled distributed computing platform markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**316.**    Microsoft's anticompetitive acts have harmed consumers and competition in global commerce, including United States interstate and foreign commerce.

**317.**    Although Microsoft has since modified some of these agreements, the continuing anticompetitive effects of the agreements are substantial; the modified agreements are themselves

anticompetitive, and there is a serious threat that, unless enjoined, Microsoft will re-impose the unlawful terms that it has expressed an intention it will not enforce.

318.    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 1 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, lost licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial.  Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.  Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

### TENTH CLAIM FOR RELIEF

### Illegal Monopolization of Office Productivity Suite Market in Violation of Section 2 of the Sherman Act

319.    Sun incorporates the allegations in paragraphs 1 through 318 above.

320.    Microsoft possesses monopoly power in the market for office productivity suites and the individual markets for office productivity suite applications.  Significant entry barriers characterize those markets.

321.    Through the anticompetitive conduct described above, Microsoft has willfully obtained and maintained that power in the office productivity suite market and the individual markets for office productivity suite applications by anticompetitive and unreasonably exclusionary conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Unless restrained by the Court, Microsoft will continue to unlawfully maintain its monopoly power causing irreparable and continuing harm to Sun, for which Sun has no adequate legal remedy.

322.    Microsoft's anticompetitive acts have harmed consumers and competition.

323.    Microsoft has acted with the specific intent to obtain and maintain its monopoly power, and its illegal conduct has enabled it to do so.

324.    Microsoft's conduct occurred in and affected global commerce, including United States

interstate and foreign commerce.

325.     As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Section 2 of the Sherman Act, Sun has been and will continue to be damaged by, without limitation, diminished licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial.  Sun's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.  Unless the activities complained of are enjoined, Sun will suffer immediate and irreparable injury for which Sun is without an adequate remedy at law.

## ELEVENTH CLAIM FOR RELIEF
### Cartwright Act

326.     Sun incorporates the allegations in paragraphs 1 through 325 above.

327.     Microsoft's agreements or combinations, with ISVs, Apple Computer, and Intel not to develop for, distribute, or use a non-Microsoft compatible implementation of the Java platform, unreasonably restrained trade.  The purpose and effect of these agreements was to restrain nascent competition in PC operating system and workgroup server operating system markets, causing substantial anticompetitive effects within these markets.

328.     Microsoft's agreements with OEMs and ISPs restricting the distribution of compatible implementations of the Java runtime via non-Microsoft products like Netscape Navigator also unreasonably restrained trade and restricted Sun's access to significant channels of distribution.  The purpose and effect of these agreements was to restrain nascent competition in the PC operating system and workgroup server operating system markets, causing substantial anticompetitive effects within these markets.

329.     Microsoft's agreements with OEMs, ISPs, ISVs, and enterprise customers relating to the distribution and use of Microsoft's .NET Framework also unreasonably restrain trade and restrict Sun's access to significant channels of distribution.  The purpose and effect of these agreements was to restrain

competition in the general purpose, Internet-enabled distributed computing platform market, causing substantial anticompetitive effects within that market.

330.    Microsoft's actions have violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq.  Microsoft will continue to violate the Cartwright Act causing irreparable and continuing harm to Sun, for which Sun has no adequate legal remedy.

331.    Microsoft's anticompetitive acts have harmed consumers and competition.

332.    As a direct, foreseeable, and proximate result of Microsoft's conduct in violation of Cartwright Act, Sun has been and will continue to be damaged by, without limitation, diminished licensing fees, lost computer workstations sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial.  Although unascertained, Sun's damages exceed seventy-five thousand dollars.

333.    Although Microsoft has since modified some of these agreements, the continuing anticompetitive effect of the agreements is substantial.  The modified agreements are themselves anticompetitive, and there is a serious threat that, unless enjoined, Microsoft will re-impose the unlawful terms that it has expressed an intention that it will not enforce.

### TWELFTH CLAIM FOR RELIEF
### Unfair Competition

334.    Sun incorporates the allegations in paragraphs 1 through 333 above, except insofar as any of the allegations relate to acts or omissions that both occurred prior to January 23, 2001 and were the subject of Sun Microsystems, Inc. v. Microsoft Corp., No., C97-20884 RMW (PVT) (N.D. Cal.).

335.    Microsoft's actions, as alleged, constitute unfair competition in violation of section 17200 et seq. of the California Business and Professions Code.

336.    Microsoft will continue its unlawful, unfair, and fraudulent business practices causing irreparable and continuing harm to Sun, for which Sun has no adequate legal remedy.

337.    As a direct, foreseeable, and proximate result of Microsoft's unlawful, unfair, and

fraudulent business practices, Sun has been and will continue to be damaged by, without limitation, diminished licensing fees, lost computer workstation sales, lost server sales, lost software product sales, lost storage sales, lost sales of consulting services, and a diminution in value to Sun's trademarks, reputation, and goodwill in amounts to be proven at trial. Although unascertained, Sun's damages exceed seventy-five thousand dollars.

THIRTEENTH CLAIM FOR RELIEF
**Copyright Infringement**

**338.** Sun incorporates the allegations in paragraphs 1 through 337 above.

**339.** Sun is the owner of registered copyrights in the source code for the Java Development Kit ("JDK") computer program. Attached hereto as Exhibit N are true and correct copies of: (1) the Certificate of Registration for JDK 1.0 alpha (TXu 835-277); (2) the Certificate of Registration and Supplementary Registration for version 1.0 alpha 2 of Sun's JDK (Certificate of Registration Nos. Stat. TX 4-576-685 and TX 4-825-238; (3) the Certificate of Registration for JDK 1.0 (TX 4-679-495); (4) the Certificate of Registration and Supplementary Registration for version 1.0.2 of Sun's JDK (Certificate of Registration Nos. TX 4-576-686 and TX 4-648-608); (5) the Certificate of Registration and Supplemental Registration for version 1.1 of Sun's JDK (Certificate of Registration Nos. TX 4-576-687 and TX 4-648-508); and (6) the Certificate of Registration for JDK 1.1.3 (No. TX 4-648-509).

**340.** Microsoft's Virtual Machine for Java, which Microsoft previously incorporated into a number of products, including its Internet Explorer browser and Windows operating system, is based on source code copied or derived from Sun's copyrighted JDK source code.

**341.** Microsoft is no longer incorporating its Virtual Machine for Java into Internet Explorer 6.0 and Windows XP, and is instead separately distributing the Microsoft Virtual Machine for Java by requiring users of those products to separately download and install the Microsoft Virtual Machine for Java the first time they encounter web pages containing Java applications.

**342.** Microsoft's distribution is unlicensed because it is outside the scope of Microsoft's limited license under the Settlement Agreement between Sun and Microsoft, and therefore constitutes

copyright infringement under 17 U.S.C. § 501 et seq.

343.    Microsoft's infringement of Sun's copyright in its source code has caused and, if not enjoined, will continue to cause irreparable and continuing harm to Sun, for which Sun has no adequate legal remedy.

344.    As a direct and proximate result of Microsoft's wrongful infringement of Sun's copyright in its source code, Sun has been and will continue to be damaged by, without limitation, a diminution in the value of its trademarks, reputation, and goodwill in an amount to be proven at trial.

345.    Microsoft's wrongful infringement of Sun's copyright in its source code is knowing, deliberate, willful, and without extenuating circumstances. Sun is therefore entitled to actual damages suffered by it as a result of the infringement and any profits of Microsoft that are attributable to the infringement, or increased statutory damages.  Sun is also entitled to its attorneys' fees and costs incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Sun prays for relief against Microsoft as follows:

346.    That the Court adjudge and decree that Microsoft:

a.    unlawfully maintained its Intel-compatible PC operating system monopoly in violation of Section 2 of the Sherman Act;

b.    unlawfully acted to obtain and maintain its web browser monopoly in violation of Section 2 of the Sherman Act;

c.    unlawfully tied Internet Explorer to its Windows PC operating system in violation of Section 1 of the Sherman Act;

d.    unlawfully attempted to monopolize the workgroup server operating system market in violation of Section 2 of the Sherman Act;

e.    unlawfully tied its Windows workgroup server operating systems to its Windows PC operating system in violation of Section 1 of the Sherman Act;

f.      unlawfully tied its IIS web server to its Windows workgroup server operating system in violation of Section 1 of the Sherman Act;

g.      unlawfully tied its Active Directory software to its Windows workgroup server and/or PC operating systems in violation of Section 1 of the Sherman Act;

h.      unlawfully tied its .NET Framework to its Windows workgroup server operating system and/or PC operating system in violation of Section 1 of the Sherman Act;

i.      engaged in unlawful exclusive dealing and other exclusionary agreements in violation of Section 1 of the Sherman Act;

j.      unlawfully obtained and maintained its office productivity applications monopoly in violation of Section 2 of the Sherman Act;

k.      unlawfully tied its Exchange Server software to its Office suite in violation of Section 1 of the Sherman Act;

l.      unlawfully tied its Active Directory software to its Exchange Server software in violation of Section 1 of the Sherman Act;

m.      violated the California Cartwright Act;

n.      unlawfully committed acts of unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.; and

o.      infringed Sun's copyrighted source code in the Java platform by distributing the Microsoft Virtual Machine for Java outside the scope of its license from Sun.

**347.**    That Microsoft, all persons acting on its behalf or under its control, and all successors thereto, be enjoined from:

a.      distributing any Microsoft Windows PC operating system or web browser unless Microsoft distributes the most current, unmodified binary implementation of the Java Runtime Environment for Windows provided by Sun to Microsoft, and ensures it is installed and enabled as the default Java Runtime Environment for any and all configurations of such products, so long as Sun's

implementation passes the relevant Java compatibility tests available from the Java Community Process, and Sun makes its implementation available on a royalty-free basis;

      b.      distributing Microsoft's .NET Framework (Common Language Runtime, .NET Class Libraries, and ASP.NET) as part of any Windows PC operating system, Windows workgroup server operating system, office productivity applications suite, or browser, unless Microsoft distributes the most current, unmodified binary implementation of the Java Runtime Environment for Windows provided by Sun to Microsoft, and ensures it is installed and enabled as the default Java Runtime Environment for any and all configurations of such products, so long as Sun's implementation passes the relevant Java compatibility tests available from the Java Community Process, and Sun makes its implementation available on a royalty-free basis;

      c.      inducing or funding any third party to develop or distribute implementations of the Java technology that do not conform to Sun's published specifications for the Java technology;

      d.      distributing any browser product, unless at least 180 days prior to its commercial distribution of each such browser product, Microsoft discloses to the public at large all source code for such browser product, including (without limitation) a complete specification of all interfaces and protocols between such browser product and any Microsoft operating system or middleware product, and grants to the public at large a royalty-free, non-exclusive, perpetual license on a non-discriminatory basis to make, use and distribute products implementing or derived from Microsoft's source code pursuant to industry-standard open source license agreement (e.g., GNU license);

      e.      bundling Microsoft's IIS web server with Windows Server operating systems;

      f.      bundling Active Directory with its Windows PC and workgroup server operating systems;

      g.      distributing any Microsoft product that subsets or supersets any published standard or protocol approved by and available for non-discriminatory license through an independent, internationally recognized industry standards organization;

h.    distributing any Microsoft PC operating system, workgroup server operating system, and office productivity suite, unless 180 days prior to its commercial distribution of such products, Microsoft publicly discloses and licenses free of charge on a royalty-free, non-discriminatory, non-exclusive basis all interfaces, protocols, and technical information that Microsoft employs to enable Microsoft's  PC operating system, workgroup server operating system, and Office productivity suite to interoperate effectively with applications and/or platform software (e.g., workgroup server operating systems, middleware, etc.) installed on that or any other device, including (without limitation) any PC, server, telephone, personal digital assistant or set-top box;

i.    distributing Microsoft's Virtual Machine for Java unless it is shipped as an integrated component of the products listed in Exhibit D of the January 23, 2001 Settlement Agreement between Sun and Microsoft or successor versions of such products;

j.    engaging in the unlawful practices described in this Complaint and from engaging in any similar unlawful practices.

**348.**    That Microsoft, all persons acting on its behalf or under its control, and all successors thereto, be enjoined to take such further affirmative actions to undo the effects of its violations as the Court shall deem just and proper.

**349.**    That Sun recover damages as provided by law, including treble damages.

**350.**    That Sun recover the costs of this suit, including its attorneys' fees, as provided by law.

**351.**    That the Court grant such other injunctive or monetary relief as it deems just and proper.

**JURY DEMAND**

Sun demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

For the Plaintiff SUN MICROSYSTEMS, INC.

DATED:  November 10, 2003

Thomas M. Wilson, Federal Bar No. 02560
John B. Isbister, Federal Bar No. 00639
TYDINGS & ROSENBERG LLP
100 East Pratt Street, 26th Floor
Baltimore, Maryland  21202
Telephone:  (410) 752-9700
Fax: (410) 727-5460

Lloyd R. Day, Jr. (Cal. Bar. No. 90875)
James R. Batchelder (Cal. Bar. No. 136347)
Robert M. Galvin (Cal. Bar. No. 171508)
DAY CASEBEER
MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA  95014
(408) 873-0110

Michael A. Schlanger
Kirk R. Ruthenberg
SONNENSCHEIN NATH & ROSENTHAL
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
(202) 408-6400

Eugene Crew (Cal. Bar No. 34395)
Richard L. Grossman (Cal. Bar No. 112841)
TOWNSEND and TOWNSEND and CREW
LLP
Two Embarcadero Center, Eighth Floor
San Francisco, California 94111-3834
(415) 576-0200

Daniel R. Harris
CLIFFORD CHANCE LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
(650) 858-4300

_____

96.