IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP.<br>ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>*Sun Microsystems, Inc. v. Microsoft Corporation,*<br>Civil Action No. JFM-02-2739 | MDL Docket No. 1332<br>Hon. J. Frederick Motz |

**MICROSOFT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
CLAIMS 1, 4 & 10 OF SUN'S SECOND AMENDED COMPLAINT
TO THE EXTENT SUPPORTED BY FAILURE-TO-ASSIST ALLEGATIONS**

David B. Tulchin
Steven L. Holley
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:   (212) 558-4000

Thomas W. Burt
Richard J. Wallis
Linda K. Norman
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052
Telephone: (425) 706-8080

David T. McDonald
Karl J. Quackenbush
PRESTON GATES & ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158
Telephone:   (206) 623-7580

Matthew L. Larrabee
Dale A. Rice
A. Mari Mazour
HELLER EHRMAN WHITE & MCAULIFFE LLP
333 Bush Street
San Francisco, California 94104
Telephone:   (415) 772-6000

Darryl Snider
John M. Landry
HELLER EHRMAN WHITE & MCAULIFFE LLP
601 S. Figueroa Street, 40th Floor
Los Angeles, California 90017-5758
Telephone:   (213) 689-0200

Michael F. Brockmeyer
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland 21209
Telephone:   (410) 580-3000

*Attorneys for Microsoft Corporation*

January 30, 2004

I.   **INTRODUCTION**

The Supreme Court's recently issued opinion in *Verizon Communications Inc. v. Trinko*, 124 S. Ct. 872 (Jan. 13, 2004), addresses the following question: Under what circumstances does a monopolist's failure to assist a rival constitute an anticompetitive act that can give rise to liability under Section 2 of the Sherman Act? Reaffirming the general rule that even a monopolist has no duty to assist its competitors, the Court categorized its prior decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), as a "limited exception" that is "at or near the outer boundary of [Section] 2 liability." *Trinko*, 124 S. Ct. at 879-80. The Court then used the specific facts of *Aspen Skiing* — involving the termination of an established course of dealing regarding a product or service made generally available to the public — as the standard against which the complaint should be tested. After concluding that the complaint in *Trinko* failed to meet this standard, and expressly declining to recognize an exception to the general rule that there is no duty to assist competitors beyond the one set forth in *Aspen Skiing*, the Court held that the complaint failed to state a Section 2 claim.

The implications of *Trinko* for Sun's Second Amended Complaint ("SAC") are significant. A central theme of the SAC is Microsoft's alleged failure to assist Sun and to conduct Microsoft's business in a manner that would benefit Sun. The SAC contains numerous failure-to-assist allegations in support of three of its Section 2 claims: Claims 1, 4 and 10. Yet Sun does not allege (nor could it) facts that bring this case within the limited *Aspen Skiing* exception. *Trinko* affords, at this stage of the case, an opportunity for the Court to narrow this massive lawsuit and for the parties to avoid the burden and expense of litigating — through discovery and trial — failure-to-assist allegations that cannot give rise to Section 2 liability after *Trinko*. Specifically, dismissal of these claims will reduce, and in some instances obviate, the need for discovery regarding (1) allegedly undocumented interfaces in Windows relied upon by Microsoft's Office; (2) protocols and interfaces used by the Active Directory component of

1

Windows server operating systems; (3) interfaces and protocols used for interoperability between Windows client and server operating systems; and (4) "Microsoft-specific interfaces, data formats, schemas and protocols" that Microsoft Exchange uses to interoperate with Microsoft Outlook. It also will obviate the need for discovery on Microsoft's business decisions whether to "port" Microsoft Office, Microsoft Exchange and the .NET Framework to non-Microsoft operating systems. Given the breadth of these topics and the large number of witnesses with knowledge of them, the limitation on discovery would be significant, saving both parties unnecessary time and expense.

## II.     SUN'S ALLEGATIONS

Three of Sun's Section 2 claims (Claims 1, 4 and 10) rely on allegations that Microsoft has failed to assist Sun and other rivals. These allegations fall into two general categories: (i) nondisclosure to Sun and other rivals of technical information concerning the internal operation of Microsoft's software products;[1] and (ii) failure to "port" Microsoft Office, Microsoft Exchange and the .NET Framework to Sun's or other rivals' operating systems.[2] The specific failure-to-assist allegations relating to Claims 1, 4 and 10 are addressed in turn below.

---

[1] Sun seeks access to allegedly undisclosed application programming interfaces ("APIs"). SAC ¶ 201. Sun acknowledges that Windows client and server operating systems already expose thousands of APIs that third-party software applications can "call" to obtain a range of functionality. *See id.* ¶ 33. Sun also seeks access to undisclosed communication protocols, interfaces, schemas, and data formats (*id.* ¶¶ 33, 142, 154, 173, 189), all of which is valuable intellectual property that is the product of years of research and development carried out by Microsoft.

[2] Sun notes that "porting" an application developed for one operating system to enable it to run on a different operating system requires "rewriting, debugging, and testing the computer code," *id.* ¶ 40, a process that Sun acknowledges is "extremely time-consuming and expensive," *id.* ¶ 33. Sun does not explain why Microsoft should be denied the right possessed by all other software developers to determine on which operating systems its applications will run.

**First Claim for Relief**

Sun claims that Microsoft has illegally maintained a monopoly in Intel-compatible PC operating systems with its popular Windows client operating systems. Sun alleges that Microsoft fails to assist competing vendors of PC operating systems as follows:

*Failure To "Port" Microsoft Office.* Microsoft develops and licenses versions of Microsoft Office, a popular suite of applications that perform "common business tasks," for both Windows client operating systems and the Apple Macintosh operating system. SAC ¶¶ 192, 193, 196. Sun alleges that Microsoft has failed to "port" the applications that comprise Microsoft Office to other non-Microsoft operating systems, such as Sun's Solaris, and has thus failed to enhance Sun's ability to compete in the alleged market for PC operating systems. *Id.* ¶¶ 199-200.

*Failure To "Port" the .NET Framework.* Sun alleges that Microsoft's development of new and improved platform functionality for Windows operating systems, referred to as the .NET Framework, is anticompetitive. *Id.* ¶ 226. Sun alleges that the failure to develop versions of this new platform functionality for non-Microsoft operating systems such as Sun's Solaris discourages use of such rival operating systems. *Id.*

*Nondisclosure of Protocols and Interfaces Used by Active Directory.* An integral element of Microsoft's Windows 2000 Server and Windows Server 2003 server operating systems is a directory service known as Active Directory. Sun alleges that Microsoft has not disclosed the "proprietary protocols and interfaces" by which Active Directory interoperates with Windows client operating systems. *Id.* ¶ 189. According to Sun, if Active Directory becomes "dominant" in computer networks, non-Microsoft client operating systems will not be able to obtain directory services and competition from such non-Microsoft operating systems will thereby be foreclosed. *Id.* ¶¶ 189-90.

3

**Fourth Claim for Relief**

Sun claims that Microsoft is attempting to monopolize a purported market for "workgroup server operating systems" by failing to assist its competitors in various ways.

*Nondisclosure of Interfaces and Protocols Used for Interoperability between Windows Client and Server Operating Systems.* Sun alleges that Microsoft has failed to disclose to Sun and other server operating system vendors the "Microsoft-specific interfaces and protocols" that Windows server operating systems use to provide a range of services to Windows client operating systems. *Id.* ¶ 163. The allegedly withheld interfaces and protocols include those used to provide security, file and print, directory and network administration services, as well as support for distributed applications. *Id.* ¶¶ 163-65. Absent such disclosure, Sun alleges that competing server operating systems cannot interoperate with Windows client operating systems.[3] *Id.*

*Failure To "Port" Microsoft Exchange.* Microsoft developed its popular email and collaboration application, called Microsoft Exchange, to run on Windows server operating systems. Exchange interoperates with the Microsoft Outlook application that is part of Microsoft Office. *Id.* ¶ 173. Microsoft has made the business decision not to "port" Microsoft Exchange to non-Microsoft server operating systems. *Id.* ¶¶ 172-73. Sun alleges that the inability of server operating systems to run Microsoft Exchange makes them less attractive to enterprise customers. *Id.*

---

[3] To the extent Microsoft has offered for license all of the communications protocols used for communications between Windows client operating systems and Windows server operating systems pursuant to final judgments entered in *U.S. v. Microsoft Corp.*, 231 F. Supp. 2d 144 (D.D.C. 2002), and *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002), Sun alleges that this is insufficient because those communications protocols are "only incomplete and poorly documented." SAC ¶ 252.

4

***Nondisclosure of Technical Information Concerning Interoperability between Microsoft Exchange and Microsoft Outlook.*** Sun alleges that "Outlook and Exchange utilize Microsoft-specific interfaces, data formats, schemas and protocols that Microsoft refuses to disclose or license to competitors like Sun." *Id.* ¶ 173. Sun alleges that if it had access to technical information detailing the ways in which Microsoft Outlook interoperates with Microsoft Exchange, Sun and other vendors of email and collaboration applications could compete more effectively against Microsoft Exchange. *Id.* Because Microsoft Exchange runs only on Windows server operating systems, Sun contends that the purported limitations on non-Microsoft email and collaboration applications indirectly impairs demand for non-Microsoft server operating systems. *Id.* ¶ 173.[4]

**Tenth Claim for Relief**

Finally, Sun claims that Microsoft has unlawfully monopolized an alleged market for "office productivity suites" by failing to assist rivals in developing and marketing products that compete with Microsoft Office, through a *failure to disclose Windows APIs.* The version of Microsoft Office designed to run on Windows client operating systems calls upon a broad range of Windows APIs. Sun alleges that Microsoft has failed to provide Sun and other vendors of office productivity applications with "the same degree of access" to Windows APIs that the developers of Microsoft Office have. *Id.* ¶ 201. According to Sun, "[b]y providing Microsoft developers working on Office with earlier and better access to changes to the Windows APIs, Microsoft has foreclosed competition from other office productivity suites." *Id.*

---

[4] In addition, Sun alleges that Microsoft's development of new platform functionality for Windows operating systems referred to as the .NET Framework forecloses competition among server operating systems. *Id.* ¶ 226.

## III. ARGUMENT

In *Verizon v. Trinko*, the Supreme Court established a benchmark to judge the sufficiency of failure-to-assist allegations on a motion to dismiss in a Section 2 case. Reaffirming the general rule that even a monopolist has the right to choose with whom it will deal, the Court cautioned against extending the narrow exception recognized in *Aspen Skiing*. *Trinko*, 124 S. Ct. at 879. Declaring *Aspen Skiing* to be "at or near the outer boundary of [Section] 2 liability," *id.*, the Court held that where a complaint fails to allege facts that fit within the *Aspen Skiing* exception — terminating an established course of dealing regarding a product or service made generally available to others — it fails to state a claim. *Id.* at 879-80. Here, Sun's various failure-to-disclose and failure-to-"port" allegations fall far short of meeting the standard articulated by the Court in *Trinko*. To the extent Claims 1, 4 and 10 rely on those allegations, they fail as a matter of law and should be dismissed.[5]

### A. *Trinko* Establishes a Pleading Standard for Section 2 Claims Based on Failure-To-Assist Allegations.

The 1996 Telecommunications Act requires Verizon, a local exchange carrier ("LEC"), to allow rival LECs to place customer orders through Verizon's electronic operation support system ("OSS"). In *Trinko*, the plaintiff alleged that Verizon had failed to grant rivals access to its OSS in an effort to maintain a monopoly in violation of Section 2 of the Sherman Act. The 1996 Telecommunications Act did not preclude or expand the application of the antitrust laws. *Trinko*, 124 S. Ct. at 878. The issue before the Court was whether Verizon's alleged failure to assist rivals could serve as "an element of anticompetitive *conduct*" under Section 2. *Id.* at 879 (emphasis in original).

---

[5] *See* Fed. R. Civ. P. 12(b)(6); *Tate v. Pacific Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1079-80 (N.D. Cal. 2002) (dismissing Section 2 claim to extent that it relied on allegations of conduct not within purview of antitrust laws); *In re Warfarin Sodium Antitrust Litig.*, 1999-1 Trade Cas. (CCH) ¶ 72,457 at 84,219 (D. Del. 1998) (same).

The Court first stressed the "high value" placed on the right of a firm "'freely to exercise [its] own independent discretion as to parties with whom [it] will deal.'" *Id.* (quoting *U.S. v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). The Court explained that it is necessary to allow firms, even monopolists, to innovate and set themselves apart from their rivals "by establishing an infrastructure that renders them uniquely suited to serve their customers." *Trinko*, 124 S. Ct. at 879. The Court particularly noted the limited nature of any recognized exceptions to this basic right under its existing antitrust precedents. *See id.* (noting that the Court is "very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm"). The Court then chose the factual context of *Aspen Skiing* — which it described as "at or near the outer boundary of [Section] 2 liability" — to test the complaint before it. *Id.*

In *Aspen Skiing*, defendant ski mountain owner ("Ski Co.") discontinued its long-term cooperation with plaintiff ("Highlands"), a rival ski mountain owner, in which they jointly offered a multi-mountain ski ticket to consumers. Ski Co. then thwarted Highlands' unilateral efforts to recreate an alternative to the previous joint ticket by refusing to sell tickets to its ski mountain to Highlands even at full retail prices. The Court upheld a jury verdict finding this conduct to be anticompetitive under Section 2. According to *Trinko*, the facts in *Aspen Skiing* critical to its outcome were (i) Ski Co.'s discontinuation of a prior course of dealing that it had entered into voluntarily and (ii) Ski Co.'s refusal to supply a product or service, *e.g.*, tickets to its ski mountain, that it made generally available to the public. *Id.* at 879-80. These facts suggested Ski Co.'s willingness to forsake short-term profits to achieve an anticompetitive end, particularly as the costs attendant to continuing its cooperation with Highlands were already being incurred as part of Ski Co.'s business. *Id.*; *see Aspen Skiing*, 472 U.S. at 610-11 (noting that selling tickets to its ski mountain to Highlands at retail prices "would have entailed no cost to Ski. Co. itself, [and] would have provided it with immediate benefits").

Adopting the factual context of *Aspen Skiing* as a pleading standard, the *Trinko* Court observed that, unlike in *Aspen Skiing*, the complaint before it did not allege that Verizon had "voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent [the 1996 Telecommunications Act]." *Trinko*, 124 S. Ct. at 880. "[T]herefore, the defendant's prior conduct sheds no light upon the motivation of its refusal to deal — upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice." *Id.* Looking to the nature of the withheld assistance — access to Verizon's internal OSS — the Court observed that this service was "not otherwise marketed or available to the public" but "exists only deep within the bowels of Verizon," and providing access to the internal OSS would require the design and implementation of new systems. *Id.* In such circumstances, the Court declined to hold that such refusal to provide access to the internal OSS fell within the exception recognized in *Aspen Skiing*. *Id.* at 881-83.

*Trinko* provides critical guidance on the requirements for pleading a failure-to-assist claim. It narrowly construes *Aspen Skiing* and defines the outer limits of cases in which failure-to-assist allegations can give rise to liability for monopolization under Section 2. This clarifies an ambiguity perceived by some courts, which found it "not entirely clear whether the Court in *Aspen Skiing* merely intended to . . . invite the application of more general principles of antitrust analysis to unilateral refusals to deal." *Data Gen. v. Grumman Sys. Support*, 36 F.3d 1147, 1185 (1st Cir. 1994) (holding that plaintiff "need not tailor its argument to a pre-existing 'category' of unilateral refusals to deal"); s*ee Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 (9th Cir. 1997) (same). The Court's fact-sensitive analysis in *Trinko* makes clear that a monopolist has no obligation to assist its competitors whenever such an "approach might yield greater competition." *Trinko*, 124 S. Ct. at 883. Absent compelling reasons to create a new exception that "[out]weigh a realistic assessment of its costs," failure-to-assist allegations that do not conform to the facts of *Aspen Skiing* cannot support a Section 2 violation. *Id.* at 882.

The Supreme Court's decision in *Trinko* is consistent with this Court's own decision in this MDL proceeding. In *In re Microsoft Corp. Antitrust Litigation*, 274 F. Supp. 2d 743 (D. Md. 2003), this Court rejected application of the essential facilities doctrine to require Microsoft to share its intellectual property. The Court reasoned that "to require one company to provide its intellectual property to a competitor would significantly chill innovation." 274 F. Supp. 2d at 745; accord *Trinko*, 124 S. Ct. at 879. And, just as the Supreme Court observed in *Trinko, id.* at 879, 882, this Court noted the "unworkable" problems of "determination[s] [that] would have to be subject to judicial scrutiny by judges who lack the competence — either as direct decision-makers or as reviewing authorities — to decide the technical issues involved." *In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d at 745. These same considerations require dismissal of Sun's "failure to assist" allegations.

> **B.** ***Trinko* Requires Dismissal of Sun's Failure-To-Disclose and Failure-To-"Port" Allegations.**
>
> **1. Sun's Section 2 Claims Should Be Dismissed to the Extent They Rely on Alleged Failures To Disclose Technical Information.**

The Supreme Court's holding in *Trinko* requires dismissal with prejudice of Claims 1, 4 and 10 of the SAC to the extent they rely on Microsoft's alleged failure to disclose to Sun and other rivals (1) allegedly undocumented interfaces in Windows relied upon by Microsoft Office; (2) protocols and interfaces used by the Active Directory component of Windows server operating systems; (3) interfaces and protocols used for interoperability between Windows client and server operating system; and (4) "Microsoft-specific interfaces, data formats, schemas and protocols" that Microsoft Exchange uses to interoperate with Microsoft Outlook. The SAC contains no allegation that Microsoft departed from an established practice of disclosing proprietary technical information to Sun or that Microsoft makes such information generally available to the public. In the absence of such allegations, Sun cannot meet the rigorous requirements of the *Aspen Skiing* exception.

9

Without a prior course of dealing between Sun and Microsoft with respect to the proprietary technical information at issue, the failure-to-assist allegations in the SAC — like those at issue in *Trinko* — do not suggest that Microsoft's alleged failure to assist Sun was motivated by some "willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 124 S. Ct. at 880. Nor is there any allegation that Microsoft regularly makes the proprietary technical information referenced in the complaint available to competitors in the ordinary course of its business.[6]

Moreover, Sun also does not allege that it would be profitable for Microsoft to provide proprietary information to competitors to assist them in creating replicas of Microsoft products that they could use (in Sun's own formulation) to compete more effectively against Microsoft. In fact, it would be economically irrational for Microsoft to give competitors a free-ride on Microsoft's extensive research and development efforts by handing over the innovations that are the product of those efforts. As a result, the SAC does not allege anything "reveal[ing] a *distinctly* anticompetitive bent." *Trinko*, 124 S. Ct. at 880 (emphasis added).

Sun makes no secret of the fact that it seeks to use the antitrust laws to require Microsoft to share proprietary technical information that contributes to the appeal of Microsoft's products in the marketplace, *i.e.*, the "infrastructure that renders [it] uniquely suited to serve [its] customers," *id.* at 879. As in *Trinko*, such a broad application of Section 2 threatens "the incentive for the monopolist, the rival, or both to invest in those economically beneficial

---

[6] Sun alleges that Microsoft licensed Windows server operating system technology to AT&T that enabled UNIX servers to provide "particular network services such as file, print and the then-existing security system" to Windows client operating systems. SAC ¶ 156. Sun also alleges that Microsoft licensed its Component Object Model technology to another server operating system vendor. *Id.* ¶ 160. Those two agreements do not establish a general practice by Microsoft of disclosing proprietary technical information to all competitors, as opposed to occasional licensing of such information to specific firms with which Microsoft chose to deal.

10

facilities." *Id.*; *see also In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d at 745. In fact, condemning Microsoft for keeping its innovations to itself and refusing to assist competitors in copying attractive features of Microsoft's products would "'chill the very conduct the antitrust laws are designed to protect.'" *See Trinko*, 124 S. Ct. at 882 (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).

Finally, Sun's contention that Microsoft should be required to provide competitors with certain proprietary technical information would saddle the Court with the difficult task of determining when such compulsory disclosure might be appropriate and the terms on which such disclosure should occur. The Court in *Trinko* warned against this, stating a reluctance to have "antitrust courts . . . act as central planners, identifying the proper price, quantity, and other terms of dealing — a role for which they are ill suited." 124 S. Ct. at 879, 883 (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)); *accord In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d at 745.

  **2. Sun's Section 2 Claims Should Likewise Be Dismissed to the Extent They Rely on Alleged Failures To "Port" Microsoft Technology to Rival Platforms.**

Under *Trinko*, the Court should also dismiss with prejudice Claims 1 and 4 to the extent they rely on Microsoft's alleged failure to "port" Microsoft Office, Microsoft Exchange and the .NET Framework to run on non-Microsoft operating systems, such as Sun's Solaris. According to Sun, the unavailability of popular Microsoft applications and new Microsoft platform functionality impedes competition for client and server operating systems. Such allegations, however, do not provide a basis for imposing liability under Section 2.

Like the plaintiff in *Trinko*, Sun does not allege that Microsoft has terminated an established practice of "porting" Microsoft Office and Microsoft Exchange to Sun's operating system platforms. Such an allegation would be even more implausible with regard to platform technology like the .NET Framework, which was only recently added to Windows operating

systems. Absent such allegations, under *Trinko*, the failure-to-"port" allegations do not support Sun's claim that Microsoft engaged in unlawful monopolization.

Moreover, Sun's own allegations establish that Microsoft's decision not to "port" important technologies to non-Microsoft operating systems makes economic sense without regard to its allegedly adverse impact on competitors. Sun acknowledges that such "porting" requires extensive "rewriting, debugging, and testing" and is therefore an "extremely time-consuming and expensive process." SAC ¶¶ 33, 40. There is no allegation that it would be more profitable for Microsoft to devote the substantial engineering resources necessary to create versions of Microsoft Office, Microsoft Exchange and the .NET Framework that would run on Sun's Solaris and other operating systems than it would be for Microsoft to devote the same resources to creating software that runs on Windows operating systems.

In short, under *Trinko*, Microsoft has no obligation to go to the "considerable expense and effort" that would be entailed in creating new versions of Microsoft Office, Microsoft Exchange and the .NET Framework that would run on non-Microsoft operating systems. *See Trinko*, 124 S. Ct. at 880. Such dramatic intervention in the operating of the market — forcing Microsoft to develop products it has decided for valid business reasons not to develop — would raise all of the same concerns identified in *Trinko*. *Id.* at 879-80.

## IV. CONCLUSION

Claims 1, 4 and 10 depend on allegations that Sun and other Microsoft competitors would do better in the marketplace if Microsoft would help them by disclosing proprietary technical information and creating versions of Microsoft applications and platform technologies for use on non-Microsoft operating systems. But as the Supreme Court explained in *Trinko*, even a monopolist has no obligation to "alter its way of doing business whenever some other approach might yield greater competition." *Id.* at 883. Put bluntly, Microsoft has no duty to assist its competitors and allegations predicated on such a non-existent duty do not belong in this case.

Accordingly, the Court should dismiss Claims 1, 4 and 10 to the extent they rely on alleged failures to assist Sun and other competitors.

Dated:  January 30, 2004

Respectfully submitted,

By: /s/ Matthew L. Larrabee
Matthew L. Larrabee
HELLER EHRMAN WHITE & McAULIFFE LLP
333 Bush Street
San Francisco, California  94104
Telephone:  (415) 772-6000

Attorneys for Defendant MICROSOFT CORPORATION

*Additional Counsel for Microsoft Corporation:*

David B. Tulchin
Steven L. Holley
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000

Thomas W. Burt
Richard J. Wallis
Linda K. Norman
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington  98052
Telephone:  (425) 706-8080

Dale A. Rice
A. Mari Mazour
HELLER EHRMAN WHITE & MCAULIFFE LLP
333 Bush Street
San Francisco, California  94104
Telephone:  (415) 772-6000

Darryl Snider
John M. Landry
HELLER EHRMAN WHITE & MCAULIFFE LLP
601 S. Figueroa Street, 40th Floor
Los Angeles, California  90017-5758
Telephone:  (213) 689-0200

13

| | |
|---|---|
| Michael F. Brockmeyer<br>PIPER RUDNICK LLP<br>6225 Smith Avenue<br>Baltimore, Maryland 21209<br>Telephone:   (410) 580-3000 | David T. McDonald<br>Karl J. Quackenbush<br>PRESTON GATES & ELLIS LLP<br>925 Fourth Avenue, Suite 2900<br>Seattle, Washington 98104-1158<br>Telephone:   (206) 623-7580 |